PER CURIAM.
 

 Jason Wheeler appeals his conviction for first-degree murder, attempted first-degree murder and aggravated battery involving three Lake County deputy sheriffs. Wheeler was convicted of the February 9, 2005, premeditated murder of Deputy Wayne Koester and the contemporaneous attempted first-degree murder and aggravated battery with a firearm of deputies Thomas McKane and William Crotty. We have jurisdiction.
 
 See
 
 art. V, § 3(b)(1), Fla. Const. For the reasons set forth below, we affirm Wheeler’s convictions and sentences.
 

 
 *601
 
 FACTS AND PROCEDURAL HISTORY
 

 The Guilt Phase
 

 On the morning of February 9, 2005, Lake County deputies Wayne Koester, William Crotty, and Thomas McKane responded to a 911 call in a rural area of Lake County. The deputies were in uniform, each driving a marked patrol car. Upon arrival, Deputy Crotty observed Sara Heckerman with facial bruises and a gash on her head.
 
 [1]
 
 Heckerman lived with Wheeler in a travel trailer on the property. After observing Heckerman, Deputy Crotty made a decision to arrest Wheeler and Heckerman gave the deputies permission to look for Wheeler on the property. When Wheeler was not immediately located, the deputies called in a K-9 unit and a helicopter to assist in the search.
 

 As deputies McKane and Koester began to put up crime scene tape near the travel trailer, Deputy McKane heard the sound of a shell being racked into the chamber of a shotgun. He testified that he turned and saw a blast coming out of the end of a shotgun pointed at himself and Deputy Koester. Deputy McKane heard more shots being fired and then saw Deputy Crotty taking cover at the back of one of the three patrol cars. Deputy McKane saw the shooter, identified by Deputy Crotty as Wheeler, walking along the side of the patrol car and firing over the car toward where Deputy Crotty had taken cover.
 

 Deputy Crotty testified that he was talking with Heckerman next to his patrol car when he heard three shots. As he stood by the passenger side of the patrol car, he saw Deputy Koester running up the driveway, bleeding from what looked like bird-shot wounds to his face. Deputy Crotty then saw Wheeler, whom he identified in court, chasing Deputy Koester with a shotgun pointed at Deputy Koester’s back. Wheeler turned the shotgun on Deputy Crotty, wounding him in the leg. Deputy Crotty fired at Wheeler and Wheeler ran off into the woods. Deputy Crotty reported to dispatch that the shooter “keeps coming out of the woods approaching our position and shooting. One officer down, I’ve been shot.”
 

 Wheeler then came back out of the woods continuing to shoot at Deputy Crotty. At that point, Deputy Crotty asked Wheeler what he was doing and Wheeler said, “I’m going to fucking kill you, man.” As Wheeler ran back into the woods, Deputy Crotty fired in Wheeler’s direction, hitting Wheeler in the buttocks area. Deputy McKane, who had armed himself with a shotgun, was also engaged in the gun battle with Wheeler, who returned fire, injuring Deputy McKane’s leg, hand, arm, shoulder and lip.
 

 The search for Wheeler continued for several more hours with both a helicopter and tracking dogs. Another officer eventually located Wheeler lying on the ground in a densely-wooded area near a lake. Upon being detected, Wheeler stood up and screamed several times for the officer to kill him and then appeared to go for a weapon. In response, the officer then fired shots at Wheeler, which resulted in Wheeler’s permanent paralysis. Wheeler had a speaker wire wrapped around his neck and reported to another officer that he had tried to kill himself. A shotgun, which later proved to be the murder weapon, was found nearby.
 

 
 *602
 
 Deputy Koester died as a result of a shotgun blast he received from Wheeler. He was first hit in different areas of his body with nonfatal shots, causing injuries to his arms, hand, neck, buttocks and legs. These wounds were from birdshot (smaller pellets). Deputy Koester also had a nonfatal wound to his armpit and chest in which buckshot (larger pellets) entered his armpit, travelled through his chest and into his right lung causing bleeding there. According to the medical examiner, Dr. Steven Cogswell, the last and fatal shot was with birdshot pellets that entered Deputy Koester’s head above his left eye and lodged in his brain. Dr. Cogswell testified that death would have occurred between thirty seconds and one minute after infliction of the fatal head wound. The jury found Wheeler guilty as charged of the first-degree premeditated murder of Deputy Koester and guilty as charged on all the other counts. The case proceeded to the penalty phase.
 

 The Penalty Phase
 

 Evidence at the penalty phase showed that after his arrest, Wheeler was hospitalized and under guard at the Orlando Regional Medical Center due to his gunshot wounds. While there, he told a detention center guard, Richard Brown, that he had been arguing with Heckerman on the day of the murder and his main intention was “to go after” Heckerman. He told Brown that he did not like people on his property and would have shot anyone he found there. Wheeler reported to Brown that when he came out of the woods with his shotgun, he saw deputies stringing crime scene tape, and that he “had a choice” — “I could either run or I could go out in a blaze of glory.” Wheeler also described to Brown how he tried to escape on the dirt bike, jumped into the water, and later tried to retrieve his shotgun. Brown said Wheeler expressed some remorse to the nurses and to his pastor while in the hospital.
 

 The state presented victim impact evidence through Deputy Koester’s family members. The gist of the testimony of all of Deputy Koester’s family members was that he was a hard worker whose mother died when he was a young teen. He dropped out of school in the ninth grade but Deputy Koester later graduated from the police academy and served as a police officer in Umatilla, Florida, where he obtained certification to teach law enforcement. He was a dedicated family man and was a great dad to his children from his first marriage as well as to his stepchildren in his second marriage. He participated in many family functions, was a loving husband, brother and father, as well as an asset to the community as a deputy, Little League coach, and member of the National Guard. Finally, Sheriff Chris Daniels testified that Deputy Koester was in fact a sworn Lake County Deputy Sheriff. The State also presented fifty-four victim and family photographs mounted on four poster boards, depicting Deputy Koester in different settings with family members, serving in the National Guard, coaching, and at other functions.
 

 The defense presented the mitigation testimony of two of Wheeler’s friends, his pastor, and several of his family members including his mother, half sisters, aunt, uncle, and adoptive father. The net of this testimony was that Wheeler was never abused and lived a normal, happy childhood. Wheeler was a wonderful father, brother, friend, and nephew who worked hard and was remorseful for these crimes. After the doublewide mobile home Wheeler and Heckerman lived in was heavily damaged by hurricanes in 2004 and Wheeler lost his job, Wheeler was under a lot of stress, resulting in heavy methamphetamine use that changed his personality.
 
 *603
 
 Wheeler’s stress was also the result of Heekerman’s failure to take care of their children, her abuse of Wheeler, and her damage to repairs Wheeler had made on the doublewide. Wheeler’s aunt testified on cross-examination that she had told police after the murder that several years prior to the incident, Wheeler said that Heckerman would call the police one day and, when they came and started shooting at him, he would take down as many as he could before they got him.
 

 The jury recommended a sentence of death by a vote of ten to two. After the
 
 Spencer
 
 hearing,
 
 [2]
 
 the trial court entered its sentencing order on October 28, 2006, in which it found three aggravators. The court found that that the murder was cold, calculated, and premeditated (CCP) and gave that aggravator great weight. The trial court also found that the murder was committed for the purpose of avoiding or preventing a lawful arrest, and gave this aggravator great weight.
 
 See
 
 § 921.141(5)(e), Fla. Stat. (2005). The trial court recognized that where the victim is a law enforcement officer, that aggravator may not be doubled with the other statutory aggravators that are based on the same evidence. Thus, the trial court combined in this one “avoid arrest” aggravator two other statutory aggravators-that the victim was a law enforcement officer engaged in official duties and that the murder was committed to disrupt or hinder the enforcement of law.
 
 See
 
 § 921.141(5)(g), (j)) Fla. Stat. (2005). Finally, the trial court found in aggravation that Wheeler was previously convicted of a violent felony, based on his convictions of the contemporaneous violent felonies involving the other victims in this case.
 
 See
 
 § 921.141(5)(b), Fla. Stat. (2005). This aggravator was given some weight in the sentencing order.
 

 The trial court rejected a finding, as an aggravating circumstance, that the murder was especially heinous, atrocious or cruel (HAC), citing the fact that the circumstances of the shooting were similar to other cases in which this Court has rejected HAC for gunshot murders that were not accompanied by circumstances showing that the killing was conscienceless, pitiless, or unnecessarily torturous to the victim. The State has cross-appealed this ruling.
 

 In mitigation, the trial court found and accorded some weight to the statutory mit-igator that the murder was committed while Wheeler was under the influence of extreme mental and emotional disturbance.
 
 See
 
 § 921.141(6)(b), Fla. Stat. (2005). The court also found in mitigation that Wheeler’s capacity to conform his conduct to the requirements of law was substantially impaired, and accorded it some weight.
 
 See
 
 § 921.141(6)(f), Fla. Stat. (2005). Other mitigators were also found and given “minimal” to “some” weight.
 
 [3]
 
 The court concluded that “the aggravating circumstances far outweigh the mitigating circumstances,” and sentenced Wheeler to death in accord with the
 
 *604
 
 jury’s ten-to-two sentencing recommendation.
 

 Wheeler raises five issues on appeal, four of which are related to the penalty phase of the trial.
 
 [4]
 
 In addition to the issues raised by Wheeler, this Court is required to consider whether the evidence is sufficient to support his conviction and whether the death sentence is proportionate. These issues will be discussed in turn, beginning with the guilt phase issues.
 

 GUILT-PHASE ISSUES
 

 Failure to Give a Special Instruction on Heat of Passion
 

 Wheeler contends the trial court committed reversible error in denying a special instruction on “heat of passion.” We disagree and affirm the trial court’s denial of the special instruction. The instruction sought by the defense stated:
 

 It is a defense to 1st degree murder, if you find the killing of Wayne Koester was done by Jason Wteeler in the “heat of passion”.
 

 The killing of a person in the “heat of passion” is a legal concept which recognizes the temporary suspension and overthrow of the reason or judgment of the defendant by the sudden access of passion. In such case the heat of passion negates the requirement of 1st degree murder that the act be done with premeditation.
 

 Passion is the state of mind when it is powerfully acted upon and influenced by something external to itself. It is one of the emotions of the mind known as anger, rage, sudden resentment, or terror. The emotion must be present in the mind of the defendant as a result of such adequate and immediate provocation as might obscure the reason or dominate the volition of an ordinary reasonable person.
 

 If you find that Jason Wflieeler’s acts caused the death of Wayne Koester and that he acted in the “heat of passion,” you should find the defendant guilty of manslaughter.
 

 At the charge conference, defense counsel argued that the instruction should be given based on inferences from the State’s evidence that Wheeler was acting oddly, rushing in on the deputies, and later had a noose around his neck, which counsel said indicated that Wdieeler was acting in the heat of passion. Defense counsel stated that he was not suggesting that just finding people on the property justifies a heat of passion instruction, but that the jury could “infer that [Wheeler] at least saw no reason for the officers to be there, no reason to be complained of by his wife, et cetera. This is a provocation.” Wieeler supports the heat of passion instruction on appeal by citing the fact that he acted strangely and irrationally in carrying out
 
 *605
 
 the crime, was under stress, and was angry about Heckerman’s sabotage of his repairs to the doublewide.
 

 The trial court denied the special instruction on the basis that there was no evidence justifying it. The judge stated:
 

 Passion is a state of mind which when it is powerfully acted upon and influenced by something external, the emotion must be present in the mind of the defendant as a result of adequate — such adequate and immediate provocation as might obscure the reason or dominate the volition of an ordinarily reasonable person. I find no evidence to support that.
 

 The judge did give the standard jury instruction on excusable homicide, which includes a reference to “heat of passion” in its definition, and the standard jury instruction on premeditation.
 

 “Florida law is clear that a defendant is entitled to have a jury instruction on any valid defense supported by the evidence,” but “a trial judge is not required to give an instruction where there is no nexus between the evidence in the record and the requested instruction.”
 
 Mora v. State,
 
 814 So.2d 322, 330 (Fla. 2002). Moreover, “[i]n order to be entitled to a special jury instruction, [the defendant] must prove: (1) the special instruction was supported by the evidence; (2) the standard instruction did not adequately cover the theory of defense; and (3) the special instruction was a correct statement of the law and not misleading or confusing.”
 
 Stephens v. State,
 
 787 So.2d 747, 756 (Fla.2001) (footnotes omitted). '
 

 In this case, no evidence was presented by the defense or the State to support the special heat of passion instruction. Indeed, the only provocation for the shooting that was cited by defense counsel to the trial court was the fact that Hecker-man had called 911 and that deputies were on the property. The trial judge essentially found, and we agree, that the presence of deputies on the property was not evidence of “adequate and immediate provocation as might obscure the reason or dominate the volition of an ordinary reasonable person,” as specified in the special requested instruction. Accordingly, we conclude that there was no error in failing to give the special instruction and further find that the standard instructions given by the court adequately advised the jury on the issue of premeditation.
 

 Sufficiency of the Evidence
 

 Wheeler has not challenged the sufficiency of the evidence, but this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed.
 
 Jones v. State,
 
 963 So.2d 180, 184 (Fla.2007). Our complete review of the record demonstrates that the convictions are supported by competent substantial evidence. This case is not circumstantial — the State presented the eyewitness testimony of deputies Crotty and McKane. Deputy Crotty identified Wheeler as the person who was firing a shotgun at the deputies. The circumstances of the protracted gun battle with the deputies also provide competent, substantial evidence of premeditation. Wheeler was required to pump the shotgun each time to chamber a round of ammunition. Wheeler pursued the deputies and engaged in several separate gun battles with them, even after seeking refuge in the woods and then coming back out of the woods to fire his gun. There was ample time for Wheeler to contemplate his actions in the gun battle and to cease firing after fleeing into the woods, but he did not do so. Further, as Wheeler was firing the shotgun at Deputy Crotty in the vicinity of the patrol cars, he told
 
 *606
 
 Deputy Crotty, “I’m going to fucking kill you, man.”
 

 The evidence was clearly sufficient in every respect to support the conviction of first-degree premeditated murder of Deputy Koester and conviction of two counts of attempted murder and aggravated battery with a firearm involving deputies Crotty and McKane.
 

 PENALTY PHASE CLAIMS Victim Impact Evidence
 

 Wheeler’s primary point on appeal relates to the victim impact evidence, claiming that the victim impact evidence became such a feature of the penalty phase that it denied due process, fundamental fairness and a reliable jury recommendation. We first address the issue of preservation of any alleged error.
 

 Before the penalty-phase proceeding commenced, the trial court reserved ruling on Wheeler’s pretrial motion in limine in which he sought to exclude all victim impact evidence and testimony. Just prior to admission of the victim impact testimony in the penalty phase, the trial court reviewed each of the four written, proposed victim impact statements, granted defense counsel’s requests for certain redactions involving three of the statements, and allowed the redacted versions to be read to the jury. The State also presented four exhibits showing a total of fifty-four photographs of the victim and members of his family. The trial court instructed the jury that the victim impact testimony was not to be used for finding aggravation and was not to be weighed as such in their deliberations.
 

 During the entire presentation of victim impact evidence, Wheeler made no specific objections to any portion of the testimony or any particular aspect of the photographic evidence, although Wheeler renewed his general objection to presentation of any victim impact evidence. We conclude that the claim Wheeler now makes that the victim impact evidence was impermissibly made a feature of the penalty phase was not preserved by Wheeler’s general pretrial objections addressed to
 
 all
 
 victim impact evidence, where he made no specific objections to any of the evidence presented and failed to object below on the grounds argued here. It is well-established that for a claim “to be cognizable on appeal, it must be the specific contention asserted as legal ground for the objection, exception, or motion below.”
 
 F.B. v. State,
 
 852 So.2d 226, 229 (Fla.2003) (quoting
 
 Steinhorst v. State,
 
 412 So.2d 332, 338 (Fla.1982)). Moreover, in this appeal, Wheeler still fails to identify any specific error in admission of the victim impact testimony or photographs.
 
 See Deparvine v. State,
 
 995 So.2d 351, 378 (Fla.2008) (“Initially, we reject this claim [of error in admission of victim impact evidence] because Deparvine ... fails to sufficiently identify the error.”)
 

 Nevertheless, we recognize that evidence that places undue focus on victim impact, even if not objected to, can in some cases constitute a due process violation. The United States Supreme Court in
 
 Payne v. Tennessee,
 
 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), held that where state law permits, the Eighth Amendment erects no per se bar to the state presenting evidence about the victim, the impact of the murder on the victim’s family, and argument on these subjects.
 
 Id.
 
 at 827, 111 S.Ct. 2597. However, the Supreme Court also stated: “In the majority of cases, and in this case, victim impact evidence serves entirely legitimate purposes.
 
 In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for re
 
 
 *607
 

 lief.” Id.
 
 at 825, 111 S.Ct. 2597 (emphasis added). The analysis to determine if admission of victim impact evidence has violated a defendant’s due process rights in the penalty phase of a capital trial parallels the analysis for fundamental error.
 
 See, e.g., F.B.,
 
 852 So.2d at 229 (“[A]n error is deemed fundamental “when it goes to the foundation of the case or the merits of the cause of action and is equivalent to a denial of due process.’ ”). Fundamental error is also defined as error that “reach[es] down into the validity of the trial itself to the extent that [the advisory verdict] could not have been obtained without the assistance of the error.”
 
 Derrick v. State,
 
 988 So.2d 443, 463 (Fla.2008) (quoting
 
 State v. Delva,
 
 575 So.2d 643, 644-45 (Fla.1991)). Thus, we must determine if fundamental error or a violation of due process occurred in the admission of the victim impact evidence in this case.
 

 In 1988, prior to
 
 Payne,
 
 the people of Florida adopted article I, section 16(b) of the Florida Constitution. That constitutional provision protects the right of victims of crimes or their representatives to be heard at all crucial stages of criminal proceedings, “to the extent that these rights do not interfere with the constitutional rights of the accused.” Art. I, § 16(b), Fla. Const. We have cautioned, however, that “the rights provided to victims and victims’ families under article I, section 16(b) are not absolute, as they are subordinate to the rights of an accused when the rights involved are in conflict.”
 
 Booker v. State,
 
 773 So.2d 1079, 1095 (Fla. 2000).
 

 In addition to the constitutional provision, Florida statutes also allow the admission of victim impact evidence within certain parameters as outlined in
 
 Payne.
 

 [5]
 

 As the Court explained in
 
 Sexton v. State,
 
 775 So.2d 923 (Fla.2000):
 

 On the merits, section 921.141(7), Florida Statutes (1995), allows the State to introduce “victim impact” evidence, which shows “the victim’s uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death.”
 
 Damren v. State,
 
 696 So.2d 709, 712-14 (Fla.1997);
 
 see Bonifay v. State,
 
 680 So.2d 413, 419-20 (Fla.1996);
 
 Windom v. State,
 
 656 So.2d 432, 438-39 (Fla.1995);
 
 see also Payne v. Tennessee,
 
 501 U.S. 808, 821-26, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991).
 

 Although the United States Supreme Court and this Court have ruled that victim impact testimony is admissible, such testimony has specific limits. Those witnesses providing victim impact testimony are prohibited from giving characterizations and their opinions about the crime.
 

 Id.
 
 at 932 (footnote omitted). In our most recent pronouncement on victim impact evidence, we explained that:
 

 While being alert to the possibility of undue focus, this Court has never drawn a bright line holding that a certain number of victim impact witnesses are or are not permissible. In terms of numbers,
 
 *608
 
 this Court has affirmed up to four witnesses for one victim and consistently upheld three.
 
 Belcher v. State,
 
 961 So.2d 239, 257 (Fla.) (four witnesses),
 
 cert. denied,
 
 — U.S. -, 128 S.Ct. 621, 169 L.Ed.2d 400 (2007);
 
 see also Schoenwetter,
 
 931 So.2d at 870 (three witnesses);
 
 Huggins v. State,
 
 889 So.2d 743, 765 (Fla.2004) (same).
 

 Deparvine,
 
 995 So.2d at 378. In
 
 Deparvine,
 
 the evidence of five victim impact witnesses was found admissible.
 
 Id.
 
 We also found no error in the admission of victim impact testimony of twelve witnesses in
 
 Farina v. State,
 
 801 So.2d 44 (Fla.2001).
 

 In this case, the trial court appropriately allowed four victim impact witnesses — Victor Koester, the victim’s uncle; Paula Lynn Cassella, the victim’s sister; Virginia Bevirt, the victim’s first wife and mother of his two biological children; and Ashley Koester, the victim’s current wife and mother of his stepchildren. Their testimony was for the most part confined to written victim impact statements that the trial court reviewed and redacted pursuant to specific objections of defense counsel. The testimony of these four witnesses discussed the uniqueness of Deputy Koester as an individual and explained how his death had caused a loss to both his family members and to the community. Therefore, the nature and extent of this testimony has not been shown to constitute error, fundamental or otherwise, and has not been shown to constitute a due process violation in this case.
 

 Potentially more problematic is the State’s presentation of photographic montages depicting Deputy Koester in various settings in the community and with his family. The State presented fifty-four victim and family photographs mounted on four poster boards showing the victim in different settings such as with family members, holding babies, serving in the National Guard, and coaching. There is nothing in our case law or the victim impact statute that prevents the State from presenting photographs as part of its victim impact evidence and, as with victim impact evidence from witnesses, we have never drawn a bright line as to the number of permissible photographs that the State may present. In this case we conclude that neither fundamental error nor a due process violation has been demonstrated in this case by the number of photographs alone, where Wheeler has not identified any particular photograph or group of photographs that was impermissibly prejudicial so as to render the penalty phase fundamentally unfair.
 

 We do note that the trial judge was clearly concerned with the State’s victim impact evidence, advising the prosecutor:
 

 My preference would be that you offer this evidence at a
 
 Spencer
 
 hearing as opposed to in front of this jury, should we get that far. I believe that to offer it here today creates an opportunity, a significant opportunity, for error.
 

 I have spent a lot of time yesterday reading the statements from the various family members. I have spent a lot of time reading the statute. I have spent a lot of time reading every case that I could find. And my view of all the various things that I have read strikes me that this particular area would be— statements are a mine field waiting to create potentially some error that we don’t have now.
 

 My opinion with respect to testimony regarding Mr. Koester’s uniqueness and the resulting loss to the community, coupled with my obligation to make sure that the probative value is not outweighed by the prejudicial effect, makes it doubly a matter in my view of much subjectivity. My opinion — you know, I
 
 *609
 
 think that everybody could agree on what’s on the fringes. But I think when you get to topics that fall in the center, that reasonable people could disagree. And I just think it’s an area that could create error in this case where, in my view, no significant error exists, if any.
 

 However, you have the right to present that if that’s what you want to do. That’s your — I mean, you have the opportunity. I have the obligation to let you do that.
 

 Despite these reservations, the trial court properly overruled the general objection to victim impact evidence because we have repeatedly held that the United States Supreme Court, as well as our state statute, allows its introduction within limits.
 
 See, e.g., Floyd v. State,
 
 850 So.2d 383, 407 (Fla.2002) (declining invitation to recede from
 
 Window,,
 
 reiterating that the statutory procedure for addressing victim impact evidence does not impermissibly affect the weighing of aggravators and mitigators, and rejecting argument that victim impact evidence should be limited to a
 
 Spencer
 
 hearing); § 921.141(7), Fla. Stat. (2006). In this ease, the trial court accommodated every specific objection to victim impact evidence that was voiced by defense counsel. Because Wheeler has identified no reversible error committed by the trial court in admission of the victim impact evidence, we deny relief on this claim.
 

 Although, for the reasons set forth, we do not reverse based on the number of victim impact photographs presented in this case, we nevertheless caution prosecutors to be ever mindful of the limited purpose for which victim impact evidence may be introduced. Prosecutors should make every effort to ensure that the rights of victims and families, who naturally want their loved one to be remembered through testimony and pictures, do not interfere with the right of the defendant to a fair trial. We also remind prosecutors of the admonition in
 
 Payne
 
 that when presentation of victim impact evidence “is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.” 501 U.S. at 825, 111 S.Ct. 2597. We encourage trial judges to assist in ensuring that the proper balance is struck.
 

 Prosecutorial Argument During the Penalty Phase
 

 Wheeler next contends that the prosecutor repeatedly engaged in improper and prejudicial remarks to the jury during the penalty phase. Wheeler objected to only one of the alleged improper comments, and relies upon his general pretrial motions in limine for preservation of his claims of error for the remaining comments.
 
 [6]
 
 The general pretrial motion in limine does not constitute a contemporaneous objection to the prosecutor’s arguments, and the record demonstrates that even the one objected-to comment was not adequately preserved. As to the comment for which defense counsel did object, the trial court did not sustain or overrule the objection, but asked the prosecutor to clarify his argument. The prosecutor began by arguing:
 

 [Prosecutor] And if you just think back to yesterday you can recognize why that’s so. It’s obvious. The choices that Jason Wheeler made had a devastating
 
 *610
 
 impact on not just the family of Deputy Koester, but his family as well. If you tried to sit and count the number of people that have been affected by what was done, it numbers in the dozens just with Wayne Koester’s nieces and nephews. There’s six kids and two families each and four of his own. Now, that—
 

 Defense counsel objected and said: “[T]his to me is like an aggravator based on the number of people that are more [affected].” The prosecutor responded:
 

 It is not in any way intended to be argued as an aggravator. It is simply for them to understand that everybody has been affected by this. And my further comment will be, that’s not what they can make their decision on.
 

 The court then said, “Make that clear and limit it as best you can.” The prosecutor then clarified his argument by telling the jury:
 

 But you see, the rules tell you that that’s not what you base your decision on. That’s the whole purpose of the process is for you to try to look objectively at the choices that were made and what is the just consequence of those choices.
 

 No further objection was made after this clarification, and no motion for mistrial was made. Because this objection was not preserved, and no other specific objections were made to any of the other arguments Wheeler cites on appeal, his claims are procedurally barred. Thus, any claim of error must be shown to be fundamental for the appellant to obtain relief.
 
 See Derrick,
 
 983 So.2d at 463 (quoting
 
 Delva, 575
 
 So.2d at 644-45). With one exception that we discuss below, we conclude that the arguments of the prosecutor constituted proper comment on the evidence and the law.
 

 One unobjected-to argument, however, did exceed the proper scope of closing argument when the prosecutor, quoting writer Joseph Epstein, argued:
 

 “But within all this realm of choice-lessness, we do choose how we will live. Either courageously or cowardly, or honorably or dishonorably, with purpose or a drift, we decide what’s important and trivial in life. We decide what makes us significant is either what we do or what we refuse to do.
 

 But no matter how indifferent the entire universe may be to these choices, these choices and decisions are ours to make. We decide. We choose. And as we decide and as we choose, our destinies are formed.”
 

 That’s what I want you to look at as we walk through this case and these facts and these aggravating and mitigating circumstances.
 

 No specific objection was made to this argument, although just before penalty phase closing arguments, Wheeler had advised the trial judge that the prosecutor might attempt to argue that the jury could weigh victim impact evidence against the mitigators. Significantly, the prosecutor actually responded at that time that he did not intend to use victim impact evidence as an aggravator, but he “intended to use the victim impact as a contrast to the defendant’s mitigation of his life and his character.” The trial court was concerned whether such an argument would be proper and warned the prosecutor to couch his discussion of the victim impact evidence very circumspectly to avoid having it diminish defendant’s mitigation.
 

 Under the limited scope of the victim impact statute in Florida, victim impact evidence is not to be used by the jury to compare, contrast or weigh the relative worth of the life of the victim against that of the defendant in deciding whether to recommend the death penalty. To the extent that the prosecutor’s argument urged the jury to compare the worth of the life of
 
 *611
 
 the victim against that of Jason Wheeler, the argument is erroneous. However, we conclude that reversal is not mandated because no contemporaneous objection was made, the error has not been shown to have deprived Wheeler of a fair penalty phase, and the error has not been shown to be so inflammatory that the jury’s advisory verdict could not have been obtained without it.
 
 See Derrick,
 
 983 So.2d at 463. Nevertheless, we caution the State and its prosecutors to remain mindful of the limited purpose for which victim impact evidence may be introduced and to stay strictly within those parameters.
 

 Florida’s Capital Sentencing Statute and Penalty-Phase Jury Instructions
 

 Wheeler next claims that Florida’s capital sentencing statute and jury instructions are unconstitutional because they establish a presumption that death is the appropriate penalty and shift the burden of persuasion to the defendant. Similar claims have consistently been rejected by this Court.
 
 See Lebron v. State,
 
 982 So.2d 649, 666 (Fla.2008) (penalty-phase instructions do not improperly shift burden of proof to the defendant);
 
 Barnhill v. State,
 
 971 So.2d 106, 117 (Fla.2007) (Florida’s death penalty statute and jury instructions do not unconstitutionally shift the burden of proof);
 
 Rogers v. State,
 
 957 So.2d 538, 555 (Fla.2007) (recognizing that the standard penalty-phase jury instructions do not “impermissibly shift the burden to the defense to prove that death is not the appropriate sentence”);
 
 Reynolds v. State,
 
 934 So.2d 1128, 1151 (Fla.2006) (rejecting claim that capital sentencing statute and instruction unconstitutionally place a higher burden on the defendant to establish that life is the appropriate penalty than is placed on the State to establish that death is appropriate). Because this Court has previously rejected the same challenges to the death penalty statute and jury instructions, Wheeler’s claim for relief on this issue is also denied.
 

 Constitutionality of Florida’s Capital Sentencing Statute under
 
 Ring
 

 Wheeler next asserts that Florida’s death penalty statute is unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), which held that a defendant has a Sixth Amendment right to have a jury find any facts upon which the legislature conditions an increase in his or her maximum punishment.
 
 Id.
 
 at 589,122 S.Ct. 2428. Wheeler contends that this principle applies even to the prior violent felony conviction aggravator.
 
 [7]
 
 This case involves a prior violent felony conviction as a basis for the trial court’s finding, which we have consistently held is outside of the dictates of
 
 Ring. See Johnson v. State,
 
 969 So.2d 938, 961 (Fla. 2007) (holding that relief is not available under
 
 Ring
 
 where one of the aggravators rests on the separate convictions for kidnapping and sexual battery, which satisfies Sixth Amendment requirements),
 
 cert. denied,
 
 — U.S. -, 128 S.Ct. 2056, 170 L.Ed.2d 799 (2008);
 
 Taylor v. State,
 
 937 So.2d 590 (Fla.2006) (rejecting claim that the existence of a prior violent felony ag-gravator does not bar application of Ring);
 
 Reynolds v. State,
 
 934 So.2d 1128, 1160 (Fla.2006) (“Furthermore, one of the aggravating circumstances found by the trial court in this case was prior convictions of a violent felony, ‘a factor which under
 
 Apprendi
 
 and
 
 Ring
 
 need not be found by the jury.’” (quoting
 
 Jones v. State,
 
 855 So.2d 611, 619 (Fla.2003)));
 
 Doorbal v. State,
 
 837 So.2d 940, 963 (Fla. 2003) (rejecting
 
 Ring
 
 claim where one of
 
 *612
 
 the aggravating circumstances found by the trial judge was defendant’s prior conviction for a violent felony). Because Wheeler was convicted by a unanimous jury of the contemporaneous violent felonies of attempted first-degree murder and aggravated battery with a firearm of deputies McKane and Crotty, relief is hereby denied on this claim.
 
 [8]
 

 Proportionality of the Death Sentence
 

 Wheeler does not challenge the proportionality of his death sentence, but this Court reviews the death sentence for proportionality “regardless of whether the issue is raised on appeal.”
 
 England v. State,
 
 940 So.2d 389, 407 (Fla.2006); see
 
 also
 
 Fla. R.App. P. 9.142(a)(6). The death penalty is “reserved only for those cases where the most aggravating and least mitigating circumstances exist.”
 
 Terry v. State,
 
 668 So.2d 954, 965 (Fla.1996). In deciding whether death is a proportionate penalty, the Court makes a “comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.”
 
 Anderson v. State,
 
 841 So.2d 390, 407-08 (Fla.2003) (citation omitted). This analysis “is not a comparison between the number of aggravating and mitigating circumstances.”
 
 Porter v. State,
 
 564 So.2d 1060, 1064 (Fla.1990). Rather, this entails “a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.”
 
 Urbin v. State,
 
 714 So.2d 411, 416 (Fla.1998). This case involves the premeditated murder of a law enforcement officer who was acting in the course of his official duties and the attempted murder of two other deputies. Thus, there are multiple crimes involving law enforcement officers, and the murder was committed to avoid arrest. Not only was the murder committed without legal justification but the trial court concluded that the CCP aggravator was established. None of the aggravators found by the trial court has been challenged and they are all clearly supported by competent, substantial evidence. Statutory mental mitigation was found and accorded some weight by the trial court.
 

 We conclude that the circumstances of the murder in this ease are similar to, although more aggravated than, other cases involving law enforcement officers in which we have upheld the death penalty as proportional.
 
 [9]
 
 In
 
 Burns v. State,
 
 699 So.2d 646 (Fla.1997), we affirmed the death sentence where the victim was a law enforcement officer who was shot after a struggle, the trial court found one merged aggravator — that the murder was committed to avoid arrest and to hinder law enforcement — and further found one statutory mitigator, along with nonstatuto-ry mitigation. In another case involving the gunshot murder of a law enforcement officer,
 
 Diaz v. State,
 
 860 So.2d 960 (Fla. 2003), the murder occurred after an altercation and a chase, and involved a separate attempted murder in the same incident.
 
 Id.
 
 at 964. The trial court found three aggravators, including HAC, and five statutory mitigating circumstances, including extreme mental or emotional disturbance and the defendant’s diminished capacity to conform his conduct to the
 
 *613
 
 law. On appeal, this Court struck HAC and left two remaining aggravating circumstances — CCP and prior violent felony conviction. Even though there were five statutory mitigators, this Court found the death sentence to be proportionate based on the circumstances present in the case.
 
 Id.
 
 at 971. Based on the specific facts and circumstances of the murder, and the aggravators and mitigators found by the trial court in this case, we conclude that when compared with other capital cases, the death sentence in this case is proportionate. Accordingly, the death sentence is affirmed.
 

 STATE’S CROSS-APPEAL
 

 The State has cross-appealed the trial court’s ruling that the murder in this case was not especially heinous, atrocious or ci’uel (HAC). Because we affirm the conviction and sentence in this case, we need not address the State’s cross-appeal.
 

 CONCLUSION
 

 After a thorough review of all the issues raised by Wheeler, and after our own independent review of the sufficiency of the evidence and the proportionality of the sentence, we affirm Wheeler’s convictions for first-degree murder and the sentence of death. We also affirm his convictions for attempted murder and aggravated battery with a firearm and the sentences imposed for those offenses.
 

 It is so ordered.
 

 QUINCE, C.J., PARIENTE, and LEWIS, JJ., and ANSTEAD, Senior Justice, concur.
 

 WELLS, J., concurs in result only with an opinion, in which CANADY and POLSTON, JJ., concur.
 

 WELLS, J., concurring in result only.
 

 I concur in the majority’s opinion as to guilt-phase issues.
 

 I concur in the majority’s decision in respect to the penalty phase and affirming the death penalty. I do not join in the majority’s opinion.
 

 I agree that the victim impact evidence did not constitute fundamental error. I do not join in the dicta statement in the majority opinion which states, with no reference to our case law, that “we recognize that evidence that places undue focus on victim impact, even if not objected to, can in some cases constitute a due process violation.” Majority op. at 606.
 

 I do not agree with the majority’s conclusion that “one unobjected-to argument, however, did exceed the proper scope of closing argument.” Majority op. at 610. The prosecution as well as defense counsel are to be given latitude in arguing the case to the jury. I do not conclude that the prosecution exceeded that latitude.
 

 CANADY and POLSTON, JJ., concur.
 

 [1]
 

 . Sara Heckerman did not testify at the trial or the penalty phase and her reason for calling 911 that morning was never explained.
 

 [2]
 

 .
 
 Spencer v. State,
 
 615 So.2d 688 (Fla.1993).
 

 [3]
 

 . The court found these other mitigating circumstances: (1) appropriate courtroom behavior — minimal weight; (2) good family background and close knit, caring family— minimal weight; (3) Wheeler was a loving and devoted father — some weight; (4) Wheeler did well in grammar and middle school— minimal weight; (5) Wheeler engaged in public service — minimal weight; (6) Wheeler has friendship ties — minimal weight; (7) Wheeler was a hard worker — minimal weight; (8) Wheeler showed remorse — minimal weight; (9) Wheeler will live the rest his life paralyzed — some weight; (10) drug and alcohol use — minimal weight; (11) Wheeler was under stress from job loss, his relationship with Heckerman, and damage to his home — some weight.
 
 See
 
 § 921.141 (6)(h), Fla. Stat. (2005).
 

 [4]
 

 . Wheeler raised the following issues on appeal: (1) whether the victim impact evidence became such a feature of the penalty phase that it denied due process, fundamental fairness and a reliable jury recommendation; (2) whether the prosecutor’s remarks were improper and inflammatory and tainted the jury during the penalty phase, rendering the entire proceeding fundamentally unfair; (3) whether the trial court reversibly erred in denying Wheeler's request for a special guilt phase juiy instruction on heat of passion; (4) whether Florida’s capital sentencing scheme and penalty phase jury instructions shifted the burden of persuasion to the defense, and whether they placed a higher burden on the defense to obtain a life sentence than on the State to obtain a death sentence by creating a presumption that death is appropriate and requiring mitigation to outweigh the aggravation in order to obtain a life sentence; and (5) whether Florida's death penalty scheme is unconstitutional under
 
 Ring v. Arizona,
 
 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).
 

 [5]
 

 . Section 921.141(7), Florida Statutes (2006), provided:
 

 VICTIM IMPACT EVIDENCE. — Once the prosecution has provided evidence of the existence of one or more aggravating circumstances as described in subsection (5), the prosecution may introduce, and subsequently argue, victim impact evidence to the jury. Such evidence shall be designed to demonstrate the victim's uniqueness as an individual human being and the resultant loss to the community’s members by the victim’s death. Characterizations and opinions about the crime, the defendant, and the appropriate sentence shall not be permitted as part of victim impact evidence.
 

 [6]
 

 . Section 90.104(1), Florida Statutes, was amended in 2003 to make a contemporaneous objection to admission or exclusion of evidence unnecessary in order to preserve the issue for appeal where a prior “definitive ruling” has been obtained.
 
 See
 
 ch. 2003-258, § 1, Laws of Fla. This statute does not apply here because it does not apply to claims of error in prosecutorial argument.
 

 [7]
 

 .
 
 See
 
 § 921.141(5)(b), Fla. Stat. (2006).
 

 [8]
 

 . A contemporaneous conviction involving another victim is included within the ambit of the prior violent felony aggravator.
 
 See Frances v. State,
 
 970 So.2d 806, 817 (Fla.2007),
 
 cert. denied,
 
 — U.S. -, 128 S.Ct. 2441, 171 L.Ed.2d 241 (2008).
 

 [9]
 

 . We do not suggest that murder of a law enforcement officer alone will always render the death penalty proportionate.