*905
 
 CIKLIN, J.
 

 Jerry Jones was charged with and found guilty of first degree premeditated murder with a firearm and possession of cocaine.
 
 [1]
 
 On appeal, Jones asserts that the trial court erred when it denied his motion for judgment of acquittal because the State failed to prove the element of premeditation. He also argues the trial judge committed reversible error in admitting statements of the victim under the dying declaration exception to the hearsay rule.
 
 [2]
 
 Because the State introduced extensive evidence from medical and weapons experts as well as pre-trial statements from Jones himself — all of which was sufficiently inconsistent with Jones’ hypothesis that the shooting was accidental — the issue of premeditation was properly submitted to the jury for resolution. Because testimony from responding police officers and a treating paramedic indicated the victim’s statements were made at a time when the victim feared his imminent death, we find that the trial court’s eviden-tiary ruling should not be disturbed.
 

 At trial, the State introduced testimony from a variety of witnesses beginning with Sheila Kohr, a woman who lived with Jones and the victim. Kohr stated that during the midnight hours of September 26-27, 2006, she and Jones argued after she saw him with a crack pipe in his mouth. She told Jones to leave the home and then walked away from him. She then stopped in the victim’s room to say goodnight to him and proceeded to her room to go to sleep. She soon heard Jones muttering to himself and then the noise of Jones’ truck door open and close. Moments later, and after she heard Jones come back inside, Kohr heard the victim ask Jones something to the effect of whether he was “through bitching yet.” Kohr then heard Jones say, “You want some of me mother fucker” and then almost instantaneously, the sound of a gun firing.
 

 After Kohr, the State presented testimony from Deputy Sheriff Augustin Saucedo. Deputy Saucedo stated that he arrived at the home and found Jones pacing, telling officers that the man inside had been shot as the result of an accidental firing. Deputy Saucedo stated that the victim was moaning and complaining of pain. Deputy Saucedo then asked the victim if he was shot on purpose to which the victim replied “yes.”
 

 Jay Curtis, a paramedic/emergency medical technician, hooked the victim up to an IV to replace fluids and give him oxygen. Curtis testified that the victim repeatedly disagreed with the paramedics’ attempts to reassure him that he would be okay. On cross-examination, Jones’ attorney asked:
 

 Q: Would you say that his — would you characterize his statement such that he knew and appreciated his condition as being that of an approach to certain and immediate death?
 

 A: Yes, I think that’s true.
 

 Curtis also testified that while the victim was being transported in an ambulance, the victim told him Jones shot him.
 

 Over Jones’ hearsay objections, the testimony from Saucedo and Curtis as to the victim’s statements was admitted as dying declarations.
 

 Detective Marty Faulkner testified that after arriving at the scene, he observed the victim in an ambulance being treated for a gunshot wound to his abdomen. Faulkner
 
 *906
 
 testified that the victim had lost a significant amount of blood and appeared very-pale, clammy looking, and was having great trouble breathing.
 

 The State then played Jones’ interview with Detective Faulkner. During this interview, Jones admitted to the shooting but claimed it was an accident because the rifle had a “hair trigger.” Jones later stated that he picked up the gun when the victim came out of his bedroom and toward him. Jones said he told the victim to stay away. At some point throughout the recorded interview, Jones stated that he thought the gun was unloaded. At another point in the interview, however, he admitted that he intentionally cocked the gun to put a bullet in the chamber as the victim approached him. After the shooting, Jones called 911, gave the phone to Kohr, grabbed some towels and unloaded the gun. Jones admitted that he smoked crack cocaine on the night of the shooting and said that while the victim was coming towards him, he feared a confrontation and “pulled the trigger and it went off.” Jones said the victim at times made him feel inferior and that it was Jones’ intent to either shoot or stab the victim because he felt threatened by him. Jones also recalled that when the victim was coming towards him, Jones said something to the effect of “come on mother fucker, you want some of me.”
 

 The State presented testimony from Indian River crime lab firearm examiner, Mark Chapman. Chapman said that the recovered Winchester 30-30 rifle had no unusual defects and functioned properly. He testified that the casing found at the scene was fired from the rifle. He opined that the rifle had a weight trigger pull
 
 [3]
 
 between 4-4.75 pounds, which was normal for this weapon.
 

 The State concluded its case in chief by presenting the testimony of Medical Examiner Dr. Roger Mittleman. Mittleman performed the autopsy on the victim and determined the cause of death was a gunshot wound to the abdomen. The State then rested.
 

 Jones moved for a judgment of acquittal as to the charge of premeditated murder with a firearm, arguing that there was no showing of premeditation and that there was a reasonable hypothesis that the victim was killed in an accidental shooting during the course of an altercation.
 

 The trial court denied the motion for judgment of acquittal and reaffirmed a previous ruling that the victim’s statements were admissible as dying declarations. We affirm.
 

 Premeditation
 

 An appellate court’s review of a motion for judgment of acquittal is
 
 de novo. Pagan v. State,
 
 830 So.2d 792, 803 (Fla.2002). “Generally, an appellate court will not reverse a conviction which is supported by competent, substantial evidence.”
 
 Id.
 
 In moving for a judgment of acquittal, a defendant “admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence.”
 
 Lynch v. State,
 
 293 So.2d 44, 45 (Fla.1974). “[T]he question of whether the evidence fails to exclude all reasonable hypotheses of innocence is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict, the verdict will not be reversed on appeal.”
 
 Hartman v. State,
 
 728 So.2d 782, 784 (Fla. 4th DCA 1999) (citation omitted).
 

 The unlawful killing of a human being when perpetrated from a “premeditated design to effect the death of the
 
 *907
 
 person killed” is murder in the first degree. § 782.04(l)(a)l., Fla. Stat. (2008). The essential element distinguishing first degree murder from second degree murder is premeditation.
 
 Green v. State,
 
 715 So.2d 940, 943 (Fla.1998). “Premeditation can be formed in a moment and need only exist ‘for such time as will allow the accused to be conscious of the nature of the act he is about to commit and the probable result of that act.’”
 
 DeAngelo v. State,
 
 616 So.2d 440, 441 (Fla.1993) (quoting
 
 Asay v. State,
 
 580 So.2d 610, 612 (Fla.1991)). Premeditation can occur a mere moment before the act of killing.
 
 See Hartman,
 
 728 So.2d at 784.
 

 “Where the element of premeditation is sought to be established by circumstantial evidence, the evidence relied upon by the state must be
 
 inconsistent
 
 with every other reasonable inference” in order to defeat a motion for judgment of acquittal.
 
 Cochran v. State,
 
 547 So.2d 928, 930 (Fla.1989) (emphasis added). “Premeditation may be inferred from the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed and the nature and manner of the wounds inflicted.”
 
 Id.
 
 at 938.
 

 The instant case is analogous to this court’s holdings in
 
 Fennell v. State,
 
 959 So.2d 810 (Fla. 4th DCA 2007) and
 
 Dixon v. State,
 
 911 So.2d 1260 (Fla. 4th DCA 2005).
 

 In
 
 Fennell,
 
 the appellant and victim lived together and were romantically involved in a volatile relationship. After one argument resulted in the defendant moving out of the home, the appellant told a few neighbors that “If I ever get back there, I am going to kill this bitch.”
 
 Id.
 
 at 812. On the night of the murder, a witness saw the victim go inside the home and immediately heard gunshots. The police were summoned and found the victim dead. The defendant was arrested and told police officers the location of the weapon. The bullets recovered from the victim’s body were a match for those fired by the recovered handgun.
 

 At trial, evidence indicated that there was no struggle or fight between the couple and that it took a heavier force to pull the trigger than most handguns. A medical examiner testified that the cause of death was one of four gunshots; a fatal shot that penetrated the back of the victim’s neck. The State rested and appellant moved for judgment of acquittal on the issue of premeditation which the trial court denied.
 
 Id.
 
 at 813. The defendant then testified that on the night of the murder, the couple was arguing about financial obligations. The defendant stated that the victim drew a gun on him and that while she was distracted, he grabbed for the gun and when the two fell to the floor, it discharged several times.
 

 After a renewed judgment of acquittal was denied, the appellant was convicted of first degree premeditated murder and appealed.
 
 Id.
 
 at 813. This court held the evidence at trial was inconsistent with the appellant’s hypothesis of an accidental discharge. In support of our decision we pointed to the lack of evidence indicating the shooting was a result of a close-contact fight, evidence that the defendant had made statements expressing intent to kill the victim prior to the shooting, as well as testimony that the amount of force necessary to activate the handgun’s trigger was sufficient to establish premeditation.
 
 Id.
 
 at 814-815.
 

 In
 
 Dixon,
 
 the appellant shot and killed the victim during an attempted robbery. The defense hypothesis at trial was that the appellant panicked during the robbery and fired the gun accidentally. 911 So.2d at 1262. The State introduced the testimony from a witness who heard someone
 
 *908
 
 say “I will shoot the mother fucker” minutes before hearing gunshots. The victim’s son, present during the crime, testified that the defendant yelled while pulling at the victim’s jewelry, “take off your jewelry, I am going to kill you.”
 
 Id.
 
 at 1262.
 

 The State argued that these statements, made just minutes before the victim was shot and killed, proved premeditation. This court agreed, holding that “[sjtate-ments of an accused expressing an intent to kill, followed not too remotely by the act of killing, may be evidence of premeditation.”
 
 Id.
 
 (quoting
 
 Sierra v. State,
 
 429 So.2d 882, 833 (Fla. 3d DCA 1983)) (holding that both general statements that the defendant would kill anyone followed by a separate statement that he would kill his wife were relevant to establish premeditation).
 

 In the matter before us, the evidence introduced by the State to prove premeditation was inconsistent with Jones’ hypothesis of an accidental discharge. Like
 
 Fennell
 
 and
 
 Dixon,
 
 shortly before the shooting Jones was heard by a witness saying that “I’ve got something for you mother fucker” and then again right before the shooting, asking the victim, “you want some of me mother fucker”? During his interrogation, Jones acknowledged making these statements — or statements of a similar nature.
 

 Also, as in
 
 Fennell,
 
 here the State introduced evidence from a firearm expert indicating the rifle was functioning normally, showed no visual defects, and performed within the normal range on the weight trigger pull test — thus militating a suggestion of an accidental discharge and refuting Jones’ claim that the rifle had a “hair trigger.”
 

 Jones himself told police officers that he cocked the rifle in order to chamber a bullet and raised and pointed the rifle directly at the victim. We find this evidence sufficient to vitiate Jones’ contention that the shooting was accidental.
 
 See Wheeler v. State,
 
 4 So.3d 599, 605 (Fla.2009) (holding that pumping a rifle to chamber a round is evidence of premeditation).
 

 The State produced substantial and competent evidence to support a finding of premeditation which was inconsistent with Jones’ hypothesis of an accidental shooting. We find that Jones’ motion for judgment of acquittal was appropriately denied.
 

 Dying Declarations
 

 “Dying declarations” are admissible as exceptions to the rule against hearsay.
 
 See
 
 § 90.804(2)(b) (2009). A dying declaration is “a statement made by a declarant while reasonably believing that his or her death was imminent, concerning the physical cause or instrumentalities of what the declarant believed to be impending death or the circumstances surrounding impending death.”
 
 Id.; see also Williams v. Stale,
 
 967 So.2d 735, 749 (Fla.2007) (“For a statement to be admissible under this hearsay exception, the declarant must believe death is imminent and inevitable with no hope of recovery.”). Although the admissibility of evidence is generally reviewed for abuse of discretion, “whether a proper and sufficient predicate has been established for the admission of a statement under the dying declaration hearsay exception is a mixed question of law and fact that is reviewed under a ‘clearly erroneous’ standard.”
 
 Id.; see also Teffeteller v. State,
 
 439 So.2d 840, 843-44 (Fla.1983).
 

 Jones contends that the victim’s statements should not have been admitted as dying declarations because the statements were not made at a time when the victim feared his imminent death. The evidence adduced at trial suggests otherwise.
 

 Testimony from Deputy Saucedo and Paramedic Curtis revealed that the victim
 
 *909
 
 said he was purposely shot by Jones. Detective Faulkner testified that he first found the victim stretched out on a gurney in an ambulance. The detective testified that the victim’s appearance was very pale and clammy looking and that he had labored breathing and was in great pain. The detective also stated the victim had lost quite a bit of blood. Paramedic Curtis stated that the victim repeatedly disagreed with medical technician assurances that he would survive.
 
 See Williams,
 
 967 So.2d at 749 (“[RJelevant to [the victim’s] perception of ... imminent death” is the victim’s recognition that he or she is attached to medical machinery and has indicated that, despite supportive attempts by hospital personnel, the patient does not believe there is hope for recovery.).
 

 We find this evidence clearly establishes that the victim’s statements were made at a time when the victim was in fear of imminent death without any hope for recovery.
 
 See Labon v. State,
 
 868 So.2d 1222 (Fla. 3d DCA 2004) (holding that statements made while victim lost sensation to his legs as a result of gunshot wounds, was rushed to the trauma center for emergency care, and, when victim saw intravenous tubes placed in his veins in preparation for emergency surgery, were made while the victim feared imminent death).
 

 Under these facts, we conclude that the admission of the victim’s statements as dying declarations was not clearly erroneous.
 

 Affirmed.
 

 TAYLOR and GERBER, JJ., concur.
 

 [1]
 

 . Jones was also charged with possession of a firearm by a convicted felon to which he entered a plea of guilty prior to trial.
 

 [2]
 

 . Jones makes additional points on appeal concerning
 
 Brady
 
 and
 
 Giglio
 
 violations, all of which we find without merit and therefore choose not to address.
 

 [3]
 

 . A “weight trigger pull” is the amount of force necessary to activate the trigger.