PER CURIAM.
Jason L. Wheeler was convicted and sentenced to death for the murder of a law enforcement officer and was convicted of attempted first-degree murder and aggravated battery of two other law enforcement officers, all Lake County deputy sheriffs. Wheeler v. State, 4 So.3d 599, 600 (Fla.2009). On direct appeal, this Court affirmed his convictions and sentence of death. Id. at 613.
In this case, Wheeler appeals the denial of his amended and supplemental motions for postconviction relief filed pursuant to Florida Rule of Criminal Procedure 3.851 and also petitions the Court for a writ of habeas corpus.[1] After an evidentiary hearing, the postconviction court denied relief in an extraordinarily thorough eighty-one-page order.[2] We affirm the denial of postconviction relief and deny the petition for a writ of habeas corpus.
FACTS AND PROCEDURAL ' HISTORY
On direct appeal, this Court described the relevant facts as follows:

The Guilt Phase

On the morning of February 9, 2005, Lake County deputies Wayne Koester, William Crotty, and Thomas McKane responded to a 911 call in a rural area of Lake County. The deputies were in uniform, each driving a marked patrol car. Upon arrival, Deputy Crotty observed Sara Heckerman with facial bruises and a gash on her head. Heck-erman lived with Wheeler in a travel trailer on the property. After observing Heckerman, Deputy Crotty made a decision to arrest Wheeler and Heckerman gave the deputies permission to look for Wheeler on the property. When Wheeler was not immediately located, the deputies called in a K-9 unit and a helicopter to assist in the search.
As deputies McKane and Koester began to put up crime scene tape near the travel trailer, Deputy McKane heard the sound of a shell being racked into the chamber of a shotgun. He testified that he turned and saw a blast coming out of the end of a shotgun pointed at himself and Deputy Koester. Deputy McKane heard more shots being fired and then saw Deputy Crotty taking cover at the back of one of the three patrol cars. Deputy McKane saw the shooter, identified by Deputy Crotty as Wheeler, walking along the side of the patrol car and firing over the car toward where Deputy Crotty had taken cover.
Deputy Crotty testified that he was talking with Heckerman next to his patrol car when he heard three shots. As he stood by the passenger side of the patrol car, he saw Deputy Koester running up the driveway, bleeding from what looked like birdshot wounds to his face. Deputy Crotty then saw Wheeler, whom he identified in court, chasing *869 Deputy Koester with a shotgun pointed at Deputy Koester’s back. Wheeler turned the shotgun on Deputy Crotty, wounding him in the leg. Deputy Crotty fired at Wheeler and Wheeler ran off into the woods. Deputy Crotty reported to dispatch that the shooter “keeps coming out of the woods approaching our position and shooting. One officer down, I’ve been shot.”
Wheeler then came back out of the woods continuing to shoot at Deputy Crotty. At that point, Deputy Crotty asked Wheeler what he was doing and Wheeler said, “I’m going to fucking kill you, man.” As Wheeler ran back into the woods, Deputy Crotty fired in Wheeler’s direction, hitting Wheeler in the buttocks area. Deputy McKane, who had armed himself with a shotgun, was also engaged in the gun battle with Wheeler, who returned fire, injuring Deputy McKane’s leg, hand, arm, shoulder and lip.
The search for Wheeler continued for several more hours with both a helicopter and tracking dogs. Another officer eventually located Wheeler lying on the ground in a densely-wooded area near a lake. Upon being detected, Wheeler stood up and screamed several times for the officer to kill him and then appeared to go for a weapon. In response, the officer then fired shots at Wheeler, which resulted in Wheeler’s permanent paralysis. Wheeler had a speaker wire wrapped around his neck and reported to another officer that he had tried to kill himself. A shotgun, which later proved to be the murder weapon, was found nearby.
Deputy Koester died as a result of a shotgun blast he received from Wheeler. He was first hit in different areas of his body with nonfatal shots, causing injuries to his arms, hand, neck, buttocks and legs. These wounds were from birdshot (smaller pellets). Deputy Koester also had a nonfatal wound to his armpit and chest in which buckshot (larger pellets) entered his armpit, trav-elled through his chest and into his right lung causing bleeding there. According to the medical examiner, Dr. Steven Cogswell, the last and fatal shot was with birdshot pellets that entered Deputy Koester’s head above his left eye and lodged in his brain. Dr. Cogswell testified that death would have occurred between thirty seconds and one minute after infliction of the fatal head wound. The jury found Wheeler guilty as charged of the first-degree premeditated murder of Deputy Koester and guilty as charged on all the other counts. The case proceeded to the penalty phase.

The Penalty Phase

Evidence at the penalty phase showed that after his arrest, Wheeler was hospitalized and under guard at the Orlando Regional Medical Center due to his gunshot wounds. While there, he told a detention center guard, Richard Brown, that he had been arguing with Hecker-man on the day of the murder and his main intention was “to go after” Hecker-man. He told Brown that he did not like people on his property , and would have shot anyone he found there. Wheeler reported to Brown that when he came out of the woods with his shotgun, he saw deputies stringing crime scene tape, and that he “had a choice”— “I could either run or I could go out in a blaze of glory.” Wheeler also described to Brown how he tried to escape on the dirt bike, jumped into the water, and later tried to retrieve his shotgun. Brown said Wheeler expressed some remorse to the nurses and to his pastor while in the hospital.
*870 The state presented victim impact evidence through Deputy Koester’s family members. The gist of the testimony of all of Deputy Koester’s family members was that he was a hard worker whose mother died when he was a young teen. He dropped out of school in the ninth grade but Deputy Koester later graduated from the police academy and served as a police officer in Umatilla, Florida, where he obtained certification to teach law enforcement. He was a dedicated family man and was a great dad to his children from his first marriage as well as to his stepchildren in his second marriage. He participated in many family functions, was a loving husband, brother and father, as well as an asset to the community as a deputy, Little League coach, and member of the National Guard. Finally, Sheriff Chris Daniels testified that Deputy Koester was in fact a sworn Lake County Deputy Sheriff. The State also presented fifty-four victim and family photographs mounted on four poster boards, depicting Deputy Koester in different settings with family members, serving in the National Guard, coaching, and at other functions.
The defense presented the mitigation testimony of two of Wheeler’s friends, his pastor, and several of his family members including his mother, half sisters, aunt, uncle, and adoptive father. The net of this testimony was that Wheeler was never abused and lived a normal, happy childhood. Wheeler was a wonderful father, brother, friend, and nephew who worked hard and was remorseful for these crimes. After the doublewide mobile home Wheeler and Heckerman lived in was heavily damaged by hurricanes in 2004 and Wheeler lost his job, Wheeler was under a lot of stress, resulting in heavy methamphetamine use that changed his personality. Wheeler’s stress was also the result of Heckerman’s failure to take care of their children, her abuse of Wheeler, and her damage to repairs Wheeler had made on the doublewide. Wheeler’s aunt testified on cross-examination that she had told police after the murder that several years prior to the incident, Wheeler said that Heckerman would call the police one day and, when they came and started shooting at him, he would take down as many as he could before they got him.
Wheeler, 4 So.3d at 601-03 (footnote omitted).
The jury recommended a sentence of death by a vote of ten to two. Id. at 603. After holding a Spencer[3] hearing, the trial court found three aggravators: (1) the murder was cold, calculated, and premeditated (CCP); (2) the murder was committed for the purpose of avoiding or preventing a lawful arrest (merged with the aggravators that the victim was a law enforcement officer engaged in official duties and that the murder was committed to disrupt or hinder the enforcement of law); and (3) Wheeler was previously convicted of a violent felony, based on his convictions for the contemporaneous violent felonies involving the other victims in this case. Id. The trial court gave the first two aggravators great weight and gave the third aggravator some weight. Id. The trial court rejected finding that the murder was especially heinous, atrocious, or cruel (HAC). Id. In mitigation, the trial court found two statutory mitigators, each of which it accorded some weight: (1) that the murder was committed while Wheeler was under the influence of extreme mental and emotional disturbance; and (2) that Wheeler’s capacity to conform *871 his conduct to the requirements of law was substantially impaired. Id. The trial court.found eleven other nonstatutory mit-igators.[4] The trial court concluded that “the aggravating circumstances far outweigh the mitigating circumstances,” and sentenced Wheeler to death in accord with the jury’s ten-to-two sentencing recommendation. Id. at 603-04.
On direct appeal, Wheeler raised five issues.[5] After a thorough review of his claims, this Court affirmed the convictions and sentence of death. Id. at 613. Wheeler then filed a petition for writ of certiora-ri to the United States Supreme Court, which was denied. Wheeler v. Florida, 558 U.S. 866, 130 S.Ct. 178, 175 L.Ed.2d 112 (2009).
Wheeler filed his initial motion for post-conviction relief, which he later amended, raising ten claims.[6] During a multi-day evidentiary hearing, Wheeler called ten witnesses to support his postconviction claims: (1) Michael Minton, a friend who used drugs with Wheeler and testified as to the quantities of drugs Wheeler was using around the time of the crime and how the drugs affected Wheeler; (2) Sara Heckerman, Wheeler’s former girlfriend, *872 who testified as to the quantities of drugs Wheeler was using around the time of the crime, how the drugs affected "Wheeler, and the events that had preceded the crime; (3) Dr. Robert Smith, a clinical psychologist and certified addiction specialist, who interviewed Wheeler’s friends, conducted an assessment of Wheeler, and provided a diagnosis as to Wheeler; (4) Dr. Patrick Ward, an addictions and substance abuse professional, who evaluated Wheeler prior to trial; (5) Lauren Stain-back, an analytical chemist, who analyzed several tubes containing a solution with Wheeler’s blood, obtained from a bandage used on Wheeler shortly after the time of the crime; (6) Dr. Bruce Goldberger, who analyzed blood obtained from the bandage that Wheeler was wearing after the time of the crime; (7) Dr. James Merikangas, a psychiatrist and clinical professor, who reviewed Wheeler’s medical records, police records, witness statements, and Wheeler’s confession to Officer Brown in order to determine whether Wheeler’s statement was voluntarily given; (8) William Gros-senbacher, Wheeler’s trial counsel who handled the guilt phase; (9) Liza Hammond, Wheeler’s trial counsel who handled the penalty phase; and (10) David Dugan, who was a friend of Wheeler and used to drink with him. The postconviction court denied relief in a very extensive and well-reasoned order.
ANALYSIS
I. Rule 3.851 Claims
Wheeler raises the following claims on appeal: (1) trial counsel rendered ineffective assistance of counsel by failing to object to testimony regarding alleged domestic violence against Heckerman; (2) trial counsel provided ineffective assistance by failing to introduce evidence to support the argument that Wheeler’s statements to corrections Officer Brown should have been suppressed; (3) trial counsel rendered ineffective assistance during the penalty phase; (4) trial counsel provided ineffective assistance by failing to make specific objections to victim impact evidence; (5) trial counsel provided ineffective assistance by failing to assert the psychotherapist-patient privilege on behalf of Wheeler or object to the testimony of Dr. Raphael Perez, who saw Wheeler while he was in jail; (6) Florida’s method of lethal injection is cruel and unusual punishment; (7) section 945.10, Florida Statutes, unconstitutionally prohibits Wheeler from knowing the identity of his execution team members; (8) Wheeler’s execution will be unconstitutional because Wheeler may be incompetent at the time of execution; and (9) cumulative error deprived Wheeler of a fundamentally fair trial.
We deny claim 6, challenging the constitutionality of the death penalty, based on our well-established precedent. See, e.g., Tompkins v. State, 994 So.2d 1072, 1081 (Fla.2008); Lightbourne v. McCollum, 969 So.2d 326, 350-53 (Fla.2007). Wheeler has not made any additional allegations that would call into question the State’s current methods of execution. For the same reason, we also summarily deny claim 7. See, e.g., Henyard v. State, 992 So.2d 120, 130 (Fla.2008) (“We previously found section 945.10 facially constitutional and decline to recede from our decision now.”). Finally, as Wheeler recognizes that his claim pertaining to incompetency at the time of execution is not yet ripe for review, we deny claim 8 without discussion.
In all of Wheeler’s five remaining individual claims, he alleges that his trial counsel rendered ineffective assistance. In order to be entitled to relief based on a claim of ineffective assistance of counsel, Wheeler must establish both that (1) “counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed *873 the defendant by the Sixth Amendment”; and (2) “counsel’s errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To meet the first prong that requires deficiency, “the defendant must show that counsel’s representation fell below an objective standard of reasonableness.” Id. at 688. As to the second prong, the appropriate test for prejudice pertaining to guilt phase claims is whether “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 694, 104 S.Ct. 2052; see also Hurst v. State, 18 So.3d 975, 1008 (Fla.2009).
With respect to those claims alleging ineffective assistance of counsel specifically during the penalty phase, penalty-phase prejudice under the Strickland standard is measured by “whether the error of trial counsel undermines this Court’s confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggrava-tors found by the trial court.” Hurst, 18 So.3d at 1013. Under this standard, a defendant is not required “to show ‘that counsel’s deficient conduct more likely than not altered the outcome’ of his penalty proceeding, but rather that he establish ‘a probability sufficient to undermine confidence in [that] outcome.’ ” Porter v. McCollum, 558 U.S. 30, 44, 130 S.Ct. 447, 175 L.Ed.2d 398 (2009) (quoting Strickland, 466 U.S. at 693-94, 104 S.Ct. 2052). “To assess that probability, [the Court] considers] ‘the totality of the available mitigation evidence ... ’ and ‘reweigh[s] it against the evidence in aggravation.’ ” Id. at 41, 130 S.Ct. 447 (quoting Williams v. Taylor, 529 U.S. 362, 397-98, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000)).
Because the postconviction court denied the ineffective assistance of counsel claims after holding an evidentiary hearing, this Court defers to the postconviction court’s findings of fact but will review its legal conclusions de novo. Kormondy v. State, 983 So.2d 418, 428 (Fla.2007). “As long as the trial court’s findings are supported by competent substantial evidence, ‘this Court will not substitute its judgment for that of the trial court on questions of fact, likewise of the credibility of the witnesses as well as the weight to be given to the evidence by the trial court.’ ” Id. (quoting Blanco v. State, 702 So.2d 1250, 1252 (Fla.1997)).
A. Failure to Object to Testimony Regarding Alleged Domestic Violence
In his first ineffectiveness claim on appeal, Wheeler asserts that his trial counsel were ineffective for failing to object to certain testimony pertaining to domestic violence that Wheeler committed against his girlfriend, Heckerman. Specifically, Wheeler points out that his trial counsel did not recall whether there was a strategic reason for failing to object to the testimony.
The postconviction court undertook a very detailed review of the record and denied relief, concluding that counsel’s failure to object did not fall below the standard of reasonably competent performance guaranteed by the Sixth Amendment. In support, the postconviction court found that the State substantially limited the testimony concerning Heckerman and noted that although Deputy Crotty described Heekerman’s injuries and made a few references to the fact that she was the victim, the testimony was not extensive and did not refer to Wheeler as committing the *874 crime. The postconviction court noted that this information was relevant because based on this factual scenario, the officers were called to the scene to investigate a disturbance and were in the process of lawfully performing their duties when the shooting occurred — a required element of proving the charge of aggravated battery on a law enforcement officer. We conclude that the postconviction court’s findings are supported by competent, substantial evidence, and that the court did not err as to its legal conclusions.
Wheeler challenges the postconviction court’s denial of relief on this claim, relying significantly on Burgos v. State, 865 So.2d 622 (Fla. 3d DCA 2004), a case in which the district court reversed a conviction for resisting arrest based on the fact that the State was permitted to elicit extensive and graphic testimony and photographs pertaining to the extent of the victim’s injuries, as well as permitting testimony that the defendant had caused those injuries and had stated that the victim “was not going to look pretty anymore.” Id. at 623-24. Burgos, however, is factually distinguishable from this case because here, there was no testimony that Wheeler caused Heckerman’s injuries and the testimony relating to the injuries was quite limited.
In this case, the challenged testimony was confined to showing that the officers arrived at Wheeler’s residence in order to investigate a crime, and while the officers were taping off the crime scene and looking for the suspect, Wheeler began to fire at them. This testimony was relevant and necessary to establish that the officers were lawfully performing their duties at the time the crime occurred, which is.a required element of aggravated battery on a law enforcement officer — a crime for which Wheeler was being tried. § 775.0823, Fla. Stat. (2005). Moreover, even in Burgos, 865 So.2d at 624, the Third District seemingly recognized that no error would have occurred if the officers had explained their presence by simply stating that they were dispatched to the trailer park and during their investigation Burgos was identified as the subject of the investigation.
Accordingly, as Wheeler has failed to demonstrate any deficient performance of counsel with respect to failing to object to this testimony, we deny this claim.
B. Failure to Sufficiently Support Whether Wheeler’s Statements to Officer Brown Should Have Been Suppressed
• In his second claim on appeal, Wheeler alleges that his counsel were ineffective for failing to properly support his motion to suppress statements that Wheeler made to Officer Brown while Wheeler was recovering from injuries sustained during the shooting. During the postcon-viction evidentiary hearing, Wheeler presented the testimony of Dr. Merikangas in support of his claim that his statements were not voluntarily and knowingly given. Because the postconviction court’s order extensively analyzed this claim, we quote its findings in detail:
As an initial matter, this Court finds that the medical records clearly do not support Dr. Merikangas’[s] conclusions. The record shows that the Defendant made the statements to Officer Brown in the Orlando Regional Medical Center wherein the Defendant recited to Brown details of the Defendant’s commission of the crimes against the Lake County deputies. These statements to Brown happened almost immediately after the Defendant was moved from the intensive care unit to a regular room. The medical records establish that the Defendant was moved to a regular room on February 17, 2009 at about 3:00 p.m. The *875 medical records clearly show that on February 17, 2005, the Defendant was examined by a psychiatrist, at 11:30 a.m. (very close in temporal proximity to the statements). The psychiatrist’s (Dr. DiCesare) report indicates that he found the following as to the Defendant’s mental status:
“Thought process is logical and goal oriented.”
“Although the patient appears somewhat lethargic, he otherwise is alert, and oriented fully.”
“Intelligence appears average.” “Judgment seems to be stable at this point.”
The medical records also show that on February 18, 2005, the Defendant was seen by a licensed clinical social worker who had received a referral from the psychiatrist to see the Defendant. The social worker’s medical notes indicated that the Defendant was “alert, oriented, cooperative, answered questions appropriately.” The floor nurse indicated in the patient education record that on February 17, 2005, that the Defendant had no barriers or considerations to learning, that he was ready to learn and that he was oriented to the unit and was taught hospital routine, safety and about advance directives. Finally, the Nursing Notes Temp. Pulse Graph show that the Defendant did not have a fever from February 17 to February 19, 2005.
In addition to the reports that specifically deal with the Defendant’s condition at the time when Officer Brown testified that the statements were made to him, a review of the medical records also shows the progress of the Defendant’s recovery from the time that he was admitted in the emergency room to his release. The Clinical Resume, Neurological Consult, Psychiatric Consult, and Surgical Critical Care Notes, provide an overview of his treatment both, generally and specifically while in the critical care unit.
As noted above, Dr. Merikangas testified that the Defendant was “most likely in a state of delirium at the time of the alleged statements.... ” His conclusion was based on five factors: (1) the Defendant had been given large doses of narcotics; (2) the Defendant had been given sedatives; (3) the Defendant had lost a great deal of blood; (4) the Defendant had suffered lung collapse and had a chest tube inserted; and (5) the Defendant had suffered infections and fevers. However when looking at these five reasons, this Court concludes that: (1) they are suppositions without factual basis; (2) generalizations not supported by any reference to the medical documents; and (3) Dr. Merikangas’[s] testimony was clearly contradicted by the medical records and by the content of Defendant’s statements.
With regard to the first two reasons, the large doses of narcotics and sedatives given to the Defendant, this Court notes that there is no temporal relationship identified by the doctor between the dosages administered to the Defendant and the statements made by the Defendant. Neither is there any testimony of the likely, much less actual, effect of any drugs upon the Defendant. To the contrary, the testimony of Officer Brown and the records of those medical service providers who were interacting with the Defendant at the time, clearly indicate that: (1) he was conscious, alert and fully oriented; (2) his thought process was logical; and (3) his judgment appeared stable.
In regard to Dr. Merikangas’[s] conclusion that the Defendant was delirious, in part, from the loss of a great deal of blood, the medical records indicate that the Defendant became hemodynamically *876 stable by February 12, 2005, and was transfused with two units of blood on that date. Dr. Merikangas’[s] conclusion that the Defendant’s delirium was caused, in part, by having a collapsed lung and chest tube, ignores the record evidence that the surgery for the lung collapse occurred on February 10, 2005. While listed on the February 11, 2005, Surgical Critical Care Daily Note as active critical care problems, both acute respiratory failure and acute anemia (see reason two above) were removed from this list by February 16, 2005, when the Surgical Critical Care Daily Note indicated the Defendant could be moved to the floor. As to infections and fevers being reasons that the Defendant was delirious, the Nursing Notes Temp. Pulse Graph show that the Defendant did not have a fever from February 17 to February 19, 2005. Also the Clinical Resume, which recounts the Defendant’s hospital course, shows that he began spiking a fever on February 21, 2005, days after the statements at issue were made to Brown.
Perhaps much more significantly, various facts contained in the Defendant’s statements were totally and completely consistent with other sources and established facts as to how the crimes occurred. Clearly, this conclusively shows that he had the ability to recall, recollect and recount his actions to Officer Brown accurately and that the Defendant was not hallucinating. If he was hallucinating, he was doing so using correct and accurate facts. This Court notes that Officer Brown’s testimony regarding the content of the Defendant’s statements was specific to the facts of the case and mirrored the testimony of the deputies. Nowhere has any evidence suggested or established that Officer Brown was in any way less that [sic] 100% credible or that the Defendant was hallucinating when he recounted the events to Brown.
(Citations omitted.)
Our review of the record demonstrates that the postconviction court’s detailed findings are supported by competent, substantial evidence. Dr. Merikangas did not provide any details or testimony to explain his opinion. Further, Dr. Merikangas’s opinion was based in part on his misinterpretation of a record, which he thought showed that a nurse observed Wheeler unable to understand and communicate English. In addition, Dr. Merikangas based his opinion in part on Officer Brown’s statement that Wheeler was talking “gibberish” at one point, but disbelieved Officer Brown’s later statement that this did not mean Wheeler was hallucinating, but that he used this term because Wheeler was talking so quietly that Officer Brown was unable to hear him.
Although Wheeler states that the post-conviction court did not review whether the statements were voluntarily given, Dr. Merikangas never testified as to how much medication Wheeler was administered on the dates in question and never provided specific information as to the effects of the medicine. Instead, Dr. Merikangas simply provided several reasons why Wheeler may have been delirious at the time of the statements — most of which were actually refuted by the record. Thus, based on Dr. Merikangas’s unsubstantiated opinion, along with the lack of information regarding any effect of the medication, even if counsel had presented an expert like Dr. Merikangas to testify at trial about the voluntariness of Wheeler’s statements to Officer Brown, Dr. Merikangas’s testimony did not establish that Wheeler’s statements were involuntarily given, and thus the trial court would not have suppressed the statements that Wheeler provided at the hospital.
*877 Accordingly, as Wheeler has failed to show why his counsel rendered deficient performance or how he could be prejudiced because the statements would not have been suppressed, he is not entitled to relief on this claim.
C. Ineffective Assistance During the Penalty Phase
In his third claim on appeal, Wheeler asserts that his counsel were deficient in failing to properly show how Wheeler’s extensive abuse of drugs led to the crime. In support, he called a number of witnesses during the postconviction evidentia-ry hearing, consisting of a number of friends who would have testified at trial as to the quantities of drugs Wheeler was using at the time of the crime; a mental health expert who talked to Wheeler’s friends and provided more extensive testimony as to how this drug abuse affected Wheeler; and experts who forensieally tested bandages that contained Wheeler’s blood from the day of the incident and demonstrated that Wheeler had illicit drugs in his system on the day of the shooting.
During the penalty phase, Wheeler called a number of witnesses who testified that Wheeler was a good person but later became addicted to drugs. Janice Wheeler, his mother, testified that Wheeler had been a wonderful person, but after his home was damaged in a hurricane and he was using an insurance settlement to fix it up, his personality changed. Based on the circumstances, Wheeler was required to live in a small travel trailer, which was always dirty, and was working night and day, with his girlfriend destroying the things that he had just fixed. His mother later learned that Wheeler had been extensively abusing crystal methamphetamine. Numerous other witnesses also testified for the defense, stating that Wheeler was a wonderful person who helped others but that he changed when he lost his home, was abused by his girlfriend, and turned to drugs. These witnesses included two half-sisters, his adopted father, his uncle, his aunt, his pastor, and three friends. Wheeler also presented the testimony of Dr. Jacqueline Olander, a mental health expert.
During the postconviction evidentiary hearing, both of Wheeler’s trial counsel testified and explained their strategy concerning the penalty phase. Trial counsel William Grossenbacher testified that the defense’s overall strategy was “to show that [Wheeler] was basically a nice guy, a hard-working guy, the- kind of fellow who took his saw and helped other people in the neighborhood when the hurricanes were devastating the area ... [but] a number of reversals and marital problems ... led to this unfortunate day.” Grossen-bacher testified that he tried to attack the CCP aggravator by showing that Wheeler was enraged. Co-counsel Liza Hammond testified in a similar manner, asserting that their overall strategy in the penalty phase was to show that Wheeler “was a good person, an average person, and a family man, devoted to his family. And he had just been under an extreme amount of stress and under the influence of drugs and did something that was totally out of character for him. He was not a danger to do anything like that in the future, that he deserved life.”
Wheeler raises three subclaims regarding trial counsel’s alleged ineffectiveness during the penalty phase. We address each in turn.

Lay Testimony

Wheeler first asserts that his trial counsel were ineffective for failing to call witnesses who could have informed the jury and the judge as to the extreme amounts of drugs that Wheeler had been abusing shortly before the crime. In sup *878 port on this claim, he called three witnesses at the postconviction evidentiary hearing: Michael Minton, Sara Hecker-man, and David Dugan. The postconviction court found that trial counsel were not ineffective for failing to call Minton, Heck-erman, and Dugan at trial, reasoning as follows:
Michael Minton, a self-proclaimed methamphetamine addict, testified that he met the Defendant in 2001 or 2002 and that the Defendant used drugs “lightly” at that time. Minton testified that after the hurricanes in 2004, the Defendant began to frequently use methamphetamine as well as alcohol and marijuana. According to Minton, the Defendant was using “ice” — a pure form of methamphetamine. He testified that, as a result of using “ice,” the Defendant would stay awake for five to seven days. Minton testified that when the Defendant started using methamphetamine, Minton noticed changes in the Defendant’s behavior including erratic behavior and paranoia. He stated that Ms. Heckerman was also using drugs and that her behavior was also erratic. Min-ton stated that about a month before the shooting, he saw the Defendant less frequently because it was “just off the wall over there.” Minton testified that he saw the Defendant several days before the shooting and described him as a “shell of who he was” and “a broken man.”
[[Image here]]
... Given the other trial testimony of Wheeler’s methamphetamine use, the house repairs and his relationship with Ms. Heckerman by Janice Wheeler, Vicky Thornberry, John Desantis, Jr. and Georgianna Armenakis, this Court finds that the testimony was, by and large, merely cumulative. Florida courts have long held that cumulative testimony cannot provide a basis for an ineffective assistance claim.
Finally, this Court notes that Minton’s testimony would not provide any evidence that the Defendant was using drugs on the day of the shooting or how much he was using. Mr. Minton testified that he saw the Defendant a few days before the shooting. The Defendant would not speak with him. That was the last time Mr. Minton saw the Defendant prior to the shootings.
[[Image here]]
Defendant faults trial counsel for failing to call Sara Heckerman, the Defendant’s girlfriend to testify at trial. At the 3.851 evidentiary hearing, Ms. Heck-erman testified that she met the Defendant in May 1998 when he came to her house to buy marijuana. She stated that the Defendant used marijuana at that time and drank alcohol. After the couple moved from Ohio to Florida, they both started to use methamphetamine. Ultimately, the couple moved to Paisley, which Ms. Heckerman described as a “giant drug hole” because of the available methamphetamine. Ms. Hecker-man testified that the Defendant’s drug use increased and that he changed as a result. After the hurricanes in 2004, the Defendant was using “everything” according to Heckerman, i.e., alcohol, ecstasy, coke, crack, marijuana, and opiates. She testified that he was using all day every day and he was using all three kinds of methamphetamine during this time. Heckerman stated that she and the Defendant stayed awake for two weeks with minimal amounts of sleep. She stated that the Defendant started to spend a lot more time alone and became more aggressive, paranoid and obnoxious towards everyone. During this time, the Defendant was also stealing things such as roof shingles, trucks, backhoes, and air compressors. Heck- *879 erman testified that the Defendant was selling drugs and that he paid the people who came over to help him with the house with methamphetamine.
Ms. Heckerman testified that the weekend before the shootings, she and the Defendant went over to Daytona Beach with David Dugan and his girlfriend. The two couples were joined by friends and “partied” the whole time they were there. She stated that the Defendant consumed ecstasy, methamphetamine, alcohol and coke. The day before the shooting, she and the Defendant had a fight in which the Defendant grabbed her by the hair and throat and ripped her shirt off. He tied her hands behind her back and held a shotgun to her head and told her he was going to kill her. She testified that the Defendant raped her in the camper. Hecker-man testified that this fight was worse than others and that she felt like she was fighting for her life. She left the home with her children and went to a hotel in Deland. Heckerman called the police the next morning.
[[Image here]]
The State argues that trial counsel concluded that Ms. Heckerman had significant potential problems as a witness and, as a matter of strategy, she should not be called. At the 3.851 evidentiary hearing, ... [tjrial counsel described her as a “loose cannon” who had too many bad things to say about the Defendant. ...
Clearly, as to Ms. Heckerman, trial counsel made a strategic decision not to call her as a witness. Heckerman was a drug addict who, if called to testify, may have related that the Defendant had raped her on the night before the murder and that he had told her that, if she called law enforcement, he would kill her and them. This strategic decision was reasonable given what trial counsel knew of Ms. Heckerman and was reasonable under the circumstances. The Defendant has failed to demonstrate that trial counsel’s rationale in deciding not to call Ms. Heckerman was not supported by competent, substantial evidence.
Moreover, this Court notes that Ms. Heckerman testified during the 3.851 hearing regarding her relationship with the Defendant, their mutual drug use, and the conditions surrounding the shooting. There was significant testimony regarding each of these issues presented during the guilt and penalty phases. Ms. Heckerman testified that she assumed the Defendant was high on the day before the shootings but she did not know for sure. She could not testify with any direct knowledge as to the Defendant’s drug use on the day of the shootings. Thus, this Court finds not only that Ms. Heckerman’s testimony would also have been cumulative, but as to the drug use on the day of the murder, the testimony was speculative. Consequently, for the reasons stated above, this Court finds that the decision not to call Ms. Heckerman was not ineffective assistance of counsel and was based upon sound trial strategy.
[[Image here]]
David Dugan, five-time convicted felon, testified on November 28, 2011.... He witnessed the Defendant using a wide variety of drugs including marijuana, methamphetamine, pills, alcohol, ecstasy, and, on one or two occasions, crack cocaine. Dugan stated that the Defendant used every day. Often, he and the Defendant would drink beer together and each would drink a case of beer in a 6-10 hour period. They would do this while also using drugs. Dugan testified that the Defendant would hear *880 things that were not there, speak with people who were not there, and would see things that were not there.
On cross-examination, Dugan stated that he was not using drugs at the time of the shootings but he was drinking alcohol. He remembered that the day after the shootings, he gave a statement to the police. Stating that he forgot a lot of the things he told the officers, Dugan admitted that if he told law enforcement that he had not seen the Defendant using drugs around the time of the murder, he had lied to the officers. Dugan testified that he did not recall telling Detective Adams that he did not know if the Defendant was using drugs at the time of the murder. He stated that he had lied because the Defendant had a lot of friends and family and that he was afraid of them. He also admitted that he had not been at the Defendant’s residence very much and had tried to be away as much as possible.-Dugan testified that he had been storing some possessions there and that he and his girlfriend “were between residences.”
This Court finds that Dugan was not a credible witness. The State impeached his testimony when Sheriffs Deputy Ken Adams testified that Dugan told law enforcement that he had not seen the Defendant using drugs, selling drugs or buying drugs. This Court further notes that the Defendant also would have been impeached with his friendship to Wheeler and his five prior felony convictions. Thus, the decision not to call Mr. Dugan was a strategic decision given what counsel knew of him and was reasonable under the circumstances.
Trial counsel could have chosen to call Mr. Minton, Ms. Heckerman and/or Mr. Dugan, who were by their own admission involved in significant illegal drug usage. The dangers of such a strategy cannot be ignored. Certainly, any detailed description of the Defendant’s drug usage can establish and support the findings of certain mitigators as was found in the original Sentencing Order. However, it is not an unfair human thought process to summarize the facts of this case as one where the evidence established that an individual who sold drugs, paid people with drugs in lieu of cash, and used drags extensively, ultimately shot and killed a law enforcement officer while wounding two others. A jury may or may not be sympathetic to such testimony and while the jury was properly instructed that only statutorily enumerated aggravating factors could be considered, this type of mitigation poses obvious dangers that should be and were considered by competent trial counsel. The fact that Ms. Hammond and Mr. Grossenbacher chose a strategy to present this information through persons who at least had the appearance of being law-abiding citizens, who were Defendant’s friends and family, was most reasonable and was not ineffective.
(Footnotes and citations omitted.) Those findings are supported by competent, substantial evidence, and the postconviction court did not err as to its legal conclusions.
A review of the record provides competent, substantial evidence for the postcon-viction court’s factual findings. Although Minton, Heckerman, and Dugan could have provided more extensive testimony regarding the pervasiveness of Wheeler’s drug addiction close in time to the murders, trial counsel had already presented testimony that Wheeler had become addicted to drags shortly before the crime. Moreover, because trial counsel chose to present this testimony through other witnesses, they were able to limit many damaging aspects of this testimony, including *881 how Wheeler had chosen to invite people who were drug users onto his property to help him repair his house and pay them through drugs, how he became more and more addicted to drugs, and how he had turned increasingly violent towards numerous individuals, including raping his girlfriend. While counsel considered presenting Heckerman, they chose not to because at the time of the trial, Heckerman “was flip-flopping back and forth on whether she was a victim or whether she wanted to help Mr. Wheeler.” Likewise, counsel considered calling Dugan, but chose not to because he was unreliable and was “as much a liability as a positive.”
The record shows that trial counsel were well aware of the substance of the testimony that these witnesses would provide but decided not to call them for strategic reasons because the witnesses in question might have hurt Wheeler and because counsel were able to present numerous witnesses who testified both as to Wheeler’s positive characteristics and his abuse of methamphetamine, after which his personality changed drastically. Indeed, much of the testimony Wheeler now contends should have been presented at trial was already presented to the jury. As this Court has held, “even if alternate witnesses could provide more detailed testimony, trial counsel is not ineffective for failing to present cumulative evidence.” Darling v. State, 966 So.2d 366, 377 (Fla.2007); see also Stewart v. State, 37 So.3d 243, 258 (Fla.2010).
In this case, trial counsel were also concerned with presenting these witnesses because they were “loose cannons” and counsel did not know how they would testify at trial. This Court has repeatedly held that “[strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel’s decision was reasonable under the norms of professional conduct.” Simmons v. State, 105 So.3d 475, 487 (Fla.2012) (quoting Occhicone v. State, 768 So.2d 1037, 1048 (Fla.2000)). As the post-conviction court aptly observed, a jury may be less sympathetic to testimony from witnesses who were by their own admission involved in significant illegal drug use and who would have testified that Wheeler was an individual who sold drugs, paid people with drugs in lieu of cash, and used drugs extensively, ultimately killing a law enforcement officer and wounding two others. Simply put, Wheeler has not shown that his counsel provided deficient performance with respect to not presenting this lay testimony during the penalty phase. Moreover, he has failed to show prejudice, as this evidence was largely cumulative. Accordingly, he is not entitled to relief on this subclaim.

Mental Health Experts

Next, Wheeler asserts that trial counsel were ineffective for failing to call better mental health experts. The post-conviction court detailed the mental health experts that were retained during the trial and reviewed the testimony from the mental health expert presented during the postconviction hearing and denied this claim as follows:
Prior to the trial, the defense sought and obtained evaluations from three different mental health experts, Dr. Patrick Ward, Dr. Douglas J. Mason, and Dr. Jacqueline Olander. .Dr. Olander was called and testified at trial.
Post-conviction counsel sought and obtained an evaluation from a fourth expert, Dr. Robert L. Smith. Dr. Smith, a clinical psychologist and certified addiction specialist, testified at the evidentia-ry hearing for the Defendant. Dr. Smith testified that he conducted a chemical dependency assessment and mental health assessment on-the Defen *882 dant. In coming to his conclusions, Dr. Smith met with the Defendant three times, interviewed a number of people including Ms. Heckerman, Mr. Dugan and Mr. Michael Minton, and reviewed a number of documents.
Dr. Smith testified that the Defendant’s diagnoses are difficult and complicated. He concluded that the Defendant is dependent on alcohol, marijuana and methamphetamine. He noted that the Defendant has been diagnosed with a depressive disorder and is currently being treated with medications for a bipolar disorder. Considering that the evidence indicated that the Defendant experienced delusions and hallucinations, he testified that the Defendant could be suffering from bipolar disorder with psychotic symptoms or methamphetamine-indueed psychosis. Dr. Smith stated that the Defendant is currently being treated with medications that are typically administered to patients who have severe mental illness with psychotic features.
Based upon his interviews with the Defendant, Ms. Heckerman, Mr. Dugan and several others, Dr. Smith concluded that the Defendant had used drugs from the time he was a teenager. Smith testified that the Defendant’s addiction progressed very rapidly — particularly after the 2004 hurricanes. Regarding the Defendant’s use of methamphetamine, Smith asserted that the long-term use of methamphetamine would impair all functioning. Individuals begin to misper-ceive situations, they have delusions, mood swings and hallucinate. Dr. Smith opined that users have violent aggressive reactions to situations, deterioration of their physical health and difficulty sleeping. He further noted that use of the drug can cause brain damage.
Dr. Smith testified that the Defendant’s primary drug use consisted of marijuana, alcohol and methamphetamine. He stated, however, that the Defendant would use whatever drugs were available including cocaine and ecstasy. As the Defendant’s drug use increased after the hurricanes, his behavior deteriorated, i.e., he would talk to people who were not there and he became paranoid. The Defendant also became more aggressive.
Dr. Smith opined that the Defendant was suffering from a methamphetamine-induced psychotic disorder. The primary characteristics of this condition are, inter alia, hallucinations, hearing and seeing things that are not based in reality, delusions, and an increase in the likelihood of aggression and violence. Dr. Smith concluded that, on the day of the shootings, the Defendant was surprised to find the police on his property and his reaction to the situation was influenced by his use of drugs. He concluded that the Defendant’s response was spontaneous and not the result of careful planning.
Defendant asserts that trial counsel was ineffective for failing to secure numerous witnesses who could have spoken with Dr. Olander regarding the Defendant’s behavior and drug use leading up to the February 9, 2005 shootings. Defendant claims that Dr. Olander’s conclusions were unsupported. With regard to the assertion that trial counsel either failed to prepare Dr. Olander or failed to call a different penalty expert, this claim must be viewed in light of the overall investigation and preparation of trial counsel to present the Defendant’s mental state mitigation. As previously stated, the post-conviction hearing record reveals that trial counsel sought assistance from three different mental health experts, Dr. Ward, Dr. Olander and Dr. Mason. The reports of all three *883 are in evidence. Mr. Grossenbacher described the process of engaging each of the experts, the problems with each, and the ultimate decision to call Dr. Olander during the Defendant’s penalty hearing. Having reviewed the three experts conclusions and opinions, trial counsel decided to use Dr. Olander. The significant difficulty faced by trial counsel was that the Defendant tested with an average IQ, an average short and long term memory, and average to above average executive function. He also showed the possibility of deception in parts of each of the experts’ testing. He presented himself as a chronic drug abuser historically and during the time immediately before the murder. He admitted to Dr. Ward that he had lied to a counselor that his parents had taken him to for counseling earlier in his life. This was the situation within which trial counsel had to make decisions about expert testimony. Dr. Olander, by her testimony, had expertise in regard to the executive function, or higher decision making and rationalizing aspects of thought and choice. She also was able to relate the effects of chronic methamphetamine abuse to the jury. These effects include paranoia, paranoid delusions, confusion, violent and homicidal behavior. This is nearly identical to the testimony of Dr. Smith. Dr. Olander testified as to how she came to her retrospective analysis:
I obtained information from Mr. Wheeler, and even more critically, I obtained information, both factual information and what we call “objective information” from the records — from police records, from depositions and also from a collateral interview that I conducted with Ms. Wheeler [Defendant’s mother],
Wheeler’s professed lack of memory was known to trial counsel from the outset of their representation of him. While Dr. Olander was aware that he professed to have no recollection of the events, she also testified that she had sufficient information to conclude her analysis. On redirect examination, trial counsel pointed out that he had discussed with Dr. Olander the statements the Defendant made while in the hospital and also played to her an audio of other statements of the Defendant that were actually recorded. This recording was not part of the evidence in the trial. Dr. Olander testified she was aware that Wheeler might not be forthcoming about the events surrounding the murder. The reality of defending the Defendant, however, was that he maintained his position that he had no memory of the events. The choices presented were to either show the Defendant as a hard core methamphetamine addict who would rape his girlfriend, threaten to kill her and law enforcement if they were called, or to present him as a likeable, helpful, caring, family man who took care of his children, neighbors and friends, who because of his drive to rebuild his house, began to take methamphetamine to work longer hours. Trial counsel chose to use this latter presentation of the Defendant in an effort to show he was a normal person caught in a bad situation and traumatized by a bad relationship. This was not an unreasonable choice for counsel to make and as such is not ineffective assistance.
The essence of this claim is that trial counsel chose the wrong form of presentation of mitigation. Through Dr. Smith and lay witnesses, postconviction counsel now posits as mitigation a terrible family life from childhood, one filled with mental illness and the drug addiction of a variety of family members and emotional and physical abuse. The mitigation now includes a lifetime of drug abuse *884 and methamphetamine abuse that caused delusions and hallucinations.
While one new witness, Michael Min-ton, might have testified as to the extent of Wheeler’s drug usage, the same information was before the jury through other witnesses’ testimony of the Defendant’s methamphetamine abuse and through the expert testimony of Dr. Olander. Instead of using convicted felons, Ms. Sara Heckerman and Mr. David Dugan and active drug addicts, Ms. Heckerman, Mr. Dugan and Mr. Minton, trial counsel painted the same picture with much more sympathetic witnesses. Dr. Smith did attempt to add through his testimony evidence as to the “heightened” effect of methamphetamine on a person with bipolar disorder, but, it is clear that Dr. Smith conceded there is NO proof that Wheeler had bipolar disorder at the time of the offense. Thus, this is essentially a cumulative evidence claim designed to question the weight that was given to the mitigating factors already found by the Court. Such a claim is not appropriate. Kilgore [v. State], 55 So.3d [487, 504 (Fla.2010) ]; see also Gudinas [v. State ], 816 So.2d [1095, 1108 (Fla.2002) ].
In addition to being a cumulative evidence claim, it is a claim essentially the same as the claims made in Rutherford v. State, 727 So.2d 216 (Fla.1997[1998]). There post conviction counsel questioned trial counsel’s decision to “humanize” the Defendant instead of offering mental health mitigation. The Court found that “humanization” was a strategic decision when counsel was aware of the alternatives, and as such was not ineffective assistance of counsel. Id. at 222-23.
Dr. Smith’s testimony also suffers from the same major defect as did Dr. dander’s. They are at odds with the evidence of what the Defendant said and what he did. When weighed with all of the admissible evidence, the Defendant predicted that he would one day get into a shootout with law enforcement; on the day before the murder he sexually assaulted his girlfriend and told her if she called the police he would kill her and them. When law enforcement arrived he ambushed them from the woods while they were working on the crime scene. He engaged in a prolonged gun battle with them where he shot 12 to 16 times while moving in and out of the woods. He told Deputy Crotty, “I’m going to fucking kill you man.” He told Officer Brown in detail what he did and why he did it. Given the strength and seriousness of the aggravating factors, it cannot be said that the Defendant’s sentencing hearing was unreliable. Rutherford, 727 So.2d at 226. As the undersigned noted in the Sentencing Order, “Mr. Wheeler’s statements, his actions during the shootings, and his actions after the shootings all support the inescapable conclusion that he was fully cognizant that what he was doing was wrong and could, or would, result in serious consequences.” Nothing presented in post-conviction to this Court has belied or diminished this conclusion in any way.
(Footnotes and citations omitted.) Those findings are supported by competent, substantial evidence, and the postconviction court did not err as to its legal conclusions.
As the postconviction court noted, trial counsel consulted with three mental health experts and ultimately presented one expert, Dr. Jacqueline Olander. At the trial, after conducting multiple interviews, including one with Wheeler’s mother, Dr. Olander concluded that “[a]t the time of the ciime, Mr. Wheeler acted under the influence of extreme mental or emotional disturbance for which there was a reasonable cause or explanation or excuse.” In addition, Dr. Olander opined that Wheel *885 er’s ability to conform his behavior was substantially impaired, based on her understanding of the way his brain was functioning, his psychological state, and the influence of social factors. She testified that Wheeler had an “impaired frontal executive functioning” due primarily to his methamphetamine use, and that chronic methamphetamine use leads to paranoia, paranoid delusions, and confusion, and can lead to violent and homicidal crimes. In addition, she testified as to the stress that Heckerman placed on Wheeler.
At the postconviction hearing, Dr. Robert Smith, a clinical psychologist and certified addiction specialist, testified that at the time of the offense, Wheeler may have had a bipolar disorder with psychotic symptoms, a methamphetamine-induced psychosis, or both. Dr. Smith also provided testimony as to the effects of chronic methamphetamine use, including delusions, paranoia, and the tendency to overreact, often with violence. Dr. Smith opined that on the day of the crime, Wheeler was suffering from substance abuse, including both intoxicating effects and a substance-induced psychotic disorder, in which he was having hallucinations and delusions and was acting on those delusions.
Wheeler, in essence, now claims that his trial counsel were ineffective in failing to present a more effective mental health expert, even though trial counsel consulted with three different experts prior to trial and ultimately chose to present Dr. dander. While Wheeler has now presented an expert that he contends supports mitigation more strongly than the mental health expert' presented at trial, a comparison between the testimony of Dr. dander and Dr. Smith shows that the mitigation introduced at the postconviction proceeding by Dr. Smith is largely cumulative to what was already presented at the penalty phase.
To the extent that Dr. Smith’s testimony is more favorable, this Court has repeatedly held that “a defendant cannot establish that trial counsel was ineffective in obtaining and presenting mental mitigation merely by presenting a new expert who has a more favorable report.” Wyatt v. State, 78 So.3d 512, 533 (Fla.2011); see also Peede v. State, 955 So.2d 480, 494 (Fla.2007) (“The fact that Peede produced more favorable expert testimony at his evidentiary hearing is- not reason enough to deem trial counsel ineffective.”). In fact, some of the testimony presented by Dr. Smith could have shown that Wheeler’s violent reactions and behavior had been occurring for months before the murders and was not an anomaly as suggested during the penalty phase.
Accordingly, as Wheeler has failed. to show that his trial counsel rendered deficient performance and has failed to show prejudice, particularly in light of the fact that most of the evidence was cumulative, Wheeler is not entitled to relief on this subclaim.

Forensic Testing

Wheeler’s final subclaim regarding the alleged penalty-phase ineffectiveness is that counsel should have sought “forensic testing” to determine whether Wheeler had methamphetamine in his blood at the time of the murder. In support, he presented the testimony of Dr. Bruce Goldberger and Lauren Stainback. In rejecting this claim, the postconviction court explained:
Post-conviction counsel now argues that the weight of these factors would have been strengthened and the weight of the aggravating factor of cold, calculated and premeditated would have been reduced or the factor not found at all if these test results were introduced as evidence. This argument overlooks the distinct and undeniable facts contained *886 in the trial court’s Sentencing Order. The best evidence of the Defendant’s intentions, given all of the testimony concerning the Defendant’s test results, were his prior statements to Vicki Thornberry of his intention to shoot it out with police, his actions while engaged in the gun battle with the deputies, his statement to Deputy Crotty that “he (Wheeler) was going to fucking kill you, man,” his flight from the scene of the crime and his statement.to Officer Brown that he could “run or go out in a blaze of glory.” The additional fact that there was methamphetamine in the Defendant’s blood does not change what he said or did. Dr. Goldberger made clear that no test could ... determine an amount of drugs, in the Defendant’s system at the time of the offense. Neither has there been any attempt by experts to explain what any particular level of methamphetamine in the blood means when contrasted with the goal oriented, calculated actions of the Defendant .in the shoot-out. There is no proof that the failure to actually test the Defendant’s blood deprived the Defendant of a reliable sentencing proceeding. Without such proof, the claim fails.
(Emphasis added and citations omitted.) Those findings are supported by competent, substantial evidence, and the postcon-viction court did not err as to its legal conclusions.
Dr. Bruce Goldberger and Lauren Stain-back conducted two different tests and determined that Wheeler’s blood at the time of the shooting tested positive for methamphetamine. Critically, however, neither expert was able to discuss how much methamphetamine Wheeler had used at the time of the crime or the effect it would have had on Wheeler. Even assuming deficiency with respect to this sub-claim, this failure is critical in any attempt to prove prejudice. The jury and the trial court were aware that Wheeler had been using methamphetamine and, in fact, the two statutory mitigators that counsel argued for and that the trial court found were based in part on “his sustained and extreme methamphetamine usage.” While defense counsel tried to rely on drug use in order to challenge the application of the CCP aggravator, Wheeler made numerous statements to various people that he had contemplated the shooting of police officers before they ever entered his property, and that he deliberately decided to kill the officers. Wheeler made such statements to his aunt months before the crime, to his girlfriend the day before the shooting, to the responding officers when he told them that he would kill them, and then after the crime, to Officer Brown, that he understood he could run away or shoot the officers and “go out in a blaze of glory.”
■ Accordingly, as Wheeler has failed to show that his trial counsel rendered deficient performance or that he was prejudiced, his subclaim fails.
D. Failure to Specifically Object to Victim Impact Evidence
In his fourth claim on appeal, Wheeler asserts that his trial counsel were ineffective for failing to make specific objections to victim impact evidence and for failing to object to comparative worth arguments. Specifically, Wheeler contends that the amount of victim impact evidence permitted during his trial violated the Due Process Clause because the evidence was so unduly prejudicial that it rendered the trial fundamentally unfair.
The record shows that in a pretrial motion, defense counsel sought to exclude victim impact testimony during the penalty phase. The trial court reviewed the victim impact testimony in a hearing and carefully ruled on each of defense counsel’s objections. On direct appeal, Wheeler’s appel *887 late counsel claimed that the victim impact evidence became such a feature of the penalty phase that it denied Wheeler his due process rights. This Court denied this claim after an exhaustive review, holding that as to the four written victim impact statements that discussed the uniqueness of Deputy Koester as an individual and explained how his death had caused a loss to both his family members and to the community, “the nature and extent of this testimony has not been shown to constitute error, fundamental or otherwise, and has not been shown to constitute a due process violation in this case.” Wheeler, 4 So.3d at 608 (emphasis added). The Court also held that with regard to the State’s presentation of photographic montages depicting Deputy Koester in various settings in the community and with his family, “neither fundamental error nor a due process violation has been demonstrated in this case by the number of photographs alone, where Wheeler has not identified any particular photograph or group of photographs that was impermissibly prejudicial so as to render the penalty phase fundamentally unfair.” Id. While we cautioned prosecutors in future cases to be mindful of due process concerns when seeking to admit victim impact photographs, we held that “the trial court properly overruled the general objection to victim impact evidence.” Id. at 609.
Wheeler first asserts that trial counsel were ineffective in failing to specifically object to one of the victim impact statements on the basis that this statement informed the jury that the victim was no longer there to assist another troubled child in school, to respond to a domestic violence call, or to assist during a hurricane disaster. With respect to this brief statement, we hold that Wheeler has not shown deficient performance or prejudice in trial counsel’s failure to object based on the circumstances of this case.
Wheeler also contends that trial counsel were ineffective in failing to make specific objections to the photographs that were admitted, including objecting to the overall number of photographs, objecting to the fact that the photographs depicted a significant number of different individuals who were affected by the victim’s death, and objecting because most of the photographs contained children, including the victim’s children and his nieces and nephews. In postconviction proceedings, however, Wheeler has failed to specifically identify which of the photographs should have been objected to or explained what impact the admission of the photographs had on the penalty phase. Wheeler has therefore demonstrated neither deficiency nor prejudice. See Hurst, 18 So.Bd at 1008, 1013.
Accordingly, as Wheeler cannot show that his counsel rendered ineffective assistance, this claim is denied.
E. Failure to Assert Psychotherapist-Patient Privilege
In his fifth claim on appeal, Wheeler contends that his trial counsel were ineffective in failing to assert the psychotherapist-patient privilege on behalf of Wheeler based on section 90.503(l)(c), Florida Statutes (2006), or otherwise object to Dr. Raphael Perez’s testimony. The postconviction court held that this privilege did not apply based on the exception in section 90.503(4)(c), Florida Statutes (2006). Section 90.503 provides in relevant part:
(2) A patient has a privilege to refuse to disclose, and to prevent any other person from disclosing, confidential communications or records made for the purpose of diagnosis or treatment of the patient’s mental or emotional condition, including alcoholism and other drug addiction, between the patient and the psychotherapist, or persons who are *888 participating in the diagnosis or treatment under the direction of the psychotherapist. This privilege includes any diagnosis made, and advice given, by the psychotherapist in the course of that relationship.
(3) The privilege may be claimed by:
(a) The patient or the patient’s attorney on the patient’s behalf.
[[Image here]]
(4) There is no privilege under this section:
[[Image here]]
(c) For communications relevant to an issue of the mental or emotional condition of the patient in any proceeding in which the patient relies upon the condition as an element of his or her claim or defense or, after the patient’s death, in any proceeding in which any party relies upon the condition as an element of the party’s claim or defense.
§ 90.503, Fla. Stat. (2006).
We deny this claim for several reasons. First, Wheeler has failed to show deficient performance in trial counsel’s failure to assert this privilege. The record reveals that Wheeler signed a release as- to Dr. Perez’s report so that his mental health expert could obtain and review his mental health record. At the penalty phase, Dr. Olander testified on behalf of Wheeler and stated that she reviewed Dr. Perez’s report and relied on it in forming her conclusion. The State then called Dr. Perez in rebuttal. Defense counsel would therefore be unable to assert this privilege because Wheeler waived the privilege when he signed a release for Dr. Olander to obtain the records and she relied upon them during the penalty phase.
Moreover, Wheeler has not established prejudice. Dr. Perez’s testimony was very brief. He stated that he met Wheeler when Wheeler was housed in the Seminole County Corrections facility in order to determine whether Wheeler needed treatment for a mental illness. He asked Wheeler if Wheeler recalled the crime, and Wheeler said that he did not recall the events, but just remembered waking up in the hospital. Dr. Perez stated that he had treated many methamphetamine users and that it was unusual in his experience and based on the literature he read to lose memory when one is abusing stimulants, and that some stimulants are prescribed to help improve memory.
Wheeler points to only two ways that Dr. Perez’s testimony allegedly prejudiced him: (1) Dr. Perez suggested that Wheeler was malingering about memory loss, which undermined Wheeler’s claim that he could not recall the events of February 9; and (2) Dr. Perez’s testimony supported the conclusion that methamphetamine use enhances cognitive function. As the postcon-viction court noted, the State elicited significant information regarding the fact that Wheeler was able to recall the facts of the crime, so the jury already had the information that Wheeler’s claim regarding memory loss was contrary to other evidence. Moreover, much of Dr. Perez’s testimony concerned his general knowledge about the effect of methamphetamine use on the brain, cognitive functions, and memory— information that would not be involved in the psychotherapist-patient privilege. The State could have called any expert to present this general information. Accordingly, we deny this claim.
F. Cumulative Error
In his final postconviction claim, Wheeler asserts that cumulative error deprived him of a fundamentally fair trial. Because Wheeler has not shown any individual error, this cumulative claim necessarily fails.
II. Habeas Claims
In his petition for writ of habeas corpus, Wheeler raises the following claims: (1) *889 his appellate counsel rendered ineffective assistance by failing to make specific claims regarding victim impact evidence; (2) his appellate counsel rendered ineffective assistance by failing to challenge CCP; (3) Florida’s capital clemency process is unconstitutional; and (4) Florida’s capital sentencing scheme is unconstitutional based on the Governor’s arbitrary power in determining which death warrant to sign.
To be entitled to habeas relief on the basis of ineffective assistance of appellate counsel, the defendant must show:
[First] the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance and, second, [that] the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result.
Bradley v. State, 33 So.3d 664, 684 (Fla.2010) (quoting Pope v. Wainwright, 496 So.2d 798, 800 (Fla.1986)). In order to meet this standard, the. defendant must meet his “burden of - alleging a specific, serious omission or overt act upon which the claim of ineffective assistance of counsel can be based.” Anderson v. State, 18 So.3d 501, 520 (Fla.2009) (quoting Freeman v. State, 761 So.2d 1055, 1069 (Fla.2000)). Importantly, “[i]f a legal issue ‘would in all probability have been found to be without merit’ had counsel raised the issue on direct appeal, the failure of appellate counsel to raise the meritless issue will not render appellate counsel’s performance ineffective.” Walls v. State, 926 So.2d 1156, 1175-76 (Fla.2006) (quoting Rutherford v. Moore, 774 So.2d 637, 643 (Fla.2000)). We address each of-Wheeler’s four habeas claims in turn.
A. Failure to Make Specific Claims Regarding Victim Impact Evidence
First, Wheeler asserts that his appellate counsel were ineffective for failing to make more specific claims regarding the victim impact photographs presented by the State. As addressed above, this Court already reviewed this claim on direct appeal and held that while the amount of photographs was “[potentially more problematic,” their admission did not amount to either fundamental error or a due process violation “where Wheeler has not identified any particular photograph or group of photographs that was impermissi-bly prejudicial so as to render the penalty phase fundamentally unfair.”' Wheeler, 4 So.3d at 608. This statement in our opinion was not an invitation for Wheeler to find new grounds to argue the same claim.
This Court has long held that “motions for habeas corpús relief may not be used as a second appeal for substantive issues that have already been raised.” Valentine v. State, 98 So.3d 44, 58 (Fla. 2012). A habeas petitioner cannot use different grounds to reargue the same issue already presented to this Court and denied. See Breedlove v. Singletary, 595 So.2d 8, 10 (Fla.1992). (“Using different grounds to reargue the same issue is also improper.... Allegations of counsel’s ineffectiveness cannot circumvent the rule that habeas corpus proceedings are not a second appeal.”). Accordingly, Wheeler is not entitled to relief on this claim.
B. Failure to Challenge CCP
In his second habeas claim, after briefly listing the general arguments that trial counsel made relating to the CCP aggravator, Wheeler summarily states, “Appellate counsel provided ineffective assistance by abandoning these arguments.” As Wheeler has completely failed to make *890 any legal argument to support this claim, this claim is insufficiently pled. See Simmons v. State, 934 So.2d 1100, 1111 n. 12 (FIa.2006) (denying defendant’s claim as waived because “counsel did not properly brief this issue for appeal”).
C. Florida’s Capital Clemency Process Is Unconstitutional
In his penultimate habeas claim, Wheeler contends that Florida’s capital clemency process is unconstitutional because he has a constitutional right to both due process and to a clemency hearing, and the state courts’ continuing practice of declining judicial review renders this scheme unconstitutional. This Court has previously considered and- denied similar such general challenges to the clemency process. See Rutherford v. State, 940 So.2d 1112, 1122 (Fla.2006) (“It is not our prerogative to second-guess the application of this exclusive executive function.” (quoting Bundy v. State, 497 So.2d 1209, 1211 (Fla.1986))); King v. State, 808 So.2d 1237, 1246 (Fla.2002). Accordingly, we deny this challenge.
D. Governor’s Arbitrary Power in Signing Death Warrants
In his final habeas claim, Wheeler asserts that because there are no meaningful standards that constrain the Governor’s absolute discretion in determining which death warrant to sign, Florida’s capital sentencing scheme violates the Eighth Amendment. This Court has previously rejected this claim. See, e.g., Valle v. State, 70 So.3d 530, 551 (Fla.), cert. denied, - U.S. -, 132 S.Ct. 54, 180 L.Ed.2d 922 (2011). As this claim has already been rejected and Wheeler provides no reason for this Court to depart from our precedent, we reject this claim.
CONCLUSION
Based on the foregoing, we affirm the postconviction court’s denial of relief, and we also deny Wheeler’s petition for a writ of habeas corpus.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, LABARGA, and PERRY, JJ., concur.
CANADY, J., concurs in result.

. We have jurisdiction. See art. V, § 3(b)(1), (9), Fla. Const.

. We commend the postconviction judge for his exceptionally detailed order, in which the judge fully analyzed all of the claims raised, reviewed the trial record in detail, and provided extensive findings of fact.

. Spencer v. State, 615 So.2d 688, 691 (Fla.1993).

. The trial court found the following nonstat-utory mitigating circumstances: (1) appropriate courtroom behavior — minimal weight; (2) good family background and close knit, caring family — minimal weight; (3) Wheeler was a loving and devoted father — some weight; (4) Wheeler did well in grammar and middle school — minimal weight; (5) Wheeler engaged in public service — minimal weight; (6) Wheeler has friendship ties — minimal weight; (7) Wheeler was a hard worker — minimal weight; (8) Wheeler showed remorse — minimal weight; (9) Wheeler will live the rest of his life paralyzed — some weight; (10) drug and alcohol use — minimal weight; and (11) Wheeler was under stress from job loss, his relationship with Heckerman, and damage to his home — some weight. Id. at 603 n. 3.

. These issues were: (1) whether the victim impact evidence became such a feature of the penalty phase that it denied Wheeler due process, fundamental fairness, and a reliable jury recommendation; (2) whether the prosecutor's remarks were improper and inflammatory and tainted the jury during the penalty phase, rendering the entire proceeding fundamentally unfair; (3) whether the trial court reversibly erred in denying Wheeler’s request for a special guilt-phase jury instruction on heat of passion; (4) whether Florida’s capital sentencing scheme and penalty-phase jury instructions shifted the burden of persuasion to the defense, and whether they placed a higher burden on the defense to obtain a life sentence than on the State to obtain a death sentence by creating a presumption that death is appropriate and requiring mitigation to outweigh the aggravation in order to obtain a life sentence; and (5) whether Florida's death penalty scheme is unconstitutional under Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). Wheeler, 4 So.3d at 604 n. 4.

.Wheeler raised the following claims in his postconviction motion below: (1) trial counsel provided ineffective assistance of counsel during the guilt phase by failing to object to testimony regarding high-powered rifles and tree stands; (2) trial counsel provided ineffective assistance of counsel during the guilt phase by failing to object to testimony regarding alleged domestic violence against Sara Heckerman; (3) trial counsel provided ineffective assistance of counsel by failing to introduce evidence to support the argument that Wheeler’s statements to Officer Brown were not reliable , or voluntaiy and should have been suppressed; (4) trial counsel provided ineffective assistance of counsel during the penalty phase by failing to investigate and present significant mitigation evidence that was available; (5) trial counsel provided ineffective assistance of counsel by failing to make specific objections to victim impact statements and object to comparative worth statements; (6) trial counsel provided ineffective assistance of counsel by failing to assert the psychotherapist-patient privilege on behalf of Wheeler; (7) Florida’s lethal injection method of execution is unconstitutional; (8) section 945.10, Florida Statutes (2010), is unconstitutional; (9) Wheeler may be incompetent at the time of execution; and (10) cumulative error deprived Wheeler of a fundamentally fair trial.